VERNON Y. KERRY AND MARY ANN KERRY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

GAIL C. KERRY AND CAROL E. KERRY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 24442-81, 24443-81.   Filed August 24, 1987.

*John W. Schmehl* and *Thomas E. Doran*, for the petitioners.

*James P. Clancy*, for the respondent.

---

WHITAKER, *Judge*: Respondent determined a deficiency in petitioners' Federal income tax for the years and in the amounts indicated:

Vernon Y. and Mary Ann Kerry—Docket No. 24442-81

| Year | Deficiency |
| --- | --- |
| 1974 | $5,176 |
| 1975 | 463,688 |
| 1976 | 69,283 |
| 1977 | 78,001 |

Gail C. and Carol E. Kerry—Docket No. 24443-81

| Year | Deficiency |
| --- | --- |
| 1974 | $5,775 |
| 1975 | 463,217 |
| 1976 | 69,283 |
| 1977 | 73,548 |

After concessions by petitioners, the sole issue for decision is whether petitioners are entitled to investment tax credits (investment credits) relating to equipment purchased by the Kerry Bros. partnership in 1974, 1975, and 1976.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioners Vernon Y. Kerry (Vernon Kerry) and Mary Ann Kerry, husband and wife throughout the years at issue,[1] and petitioners Gail C. Kerry (Gail Kerry) and Carol E. Kerry, husband and wife, resided in Portersville, Pennsylvania, at the time their petitions herein were filed.[2] Petitioners and their spouses filed joint individual income tax returns for each of the years at issue.

Vernon Kerry was president, and Gail Kerry was secretary-treasurer, of the Kerry Coal Co. (Kerry Coal), a small business corporation. Kerry Coal was incorporated on January 5, 1953, and elected to file as an S corporation on

---

[1]Vernon Kerry and Mary Ann Kerry were divorced subsequent to filing their petition, but prior to trial.

[2]Use of the term "petitioners" will hereinafter refer to petitioners Vernon Kerry and Gail Kerry, who are brothers.

October 24, 1960. Kerry Coal was actively engaged in strip mining for coal in western Pennsylvania during the years in issue. In the early 1960's, petitioners and a third brother began to acquire stock in Kerry Coal from their father. Upon their brother's death in 1969, petitioners each acquired a 50-percent interest in Kerry Coal, which they owned through the time of trial. Kerry Coal reports its taxable income based on a fiscal year ending September 30.

In early 1974, petitioners formed Kerry Bros., a general partnership whose principal business was the buying, selling, and leasing of heavy equipment and land. Pursuant to the partnership agreement, petitioners transferred title to equipment and land owned jointly by them to the partnership, and the partnership's net profits and losses were allocated to the partners in proportion to their ownership interests therein. At the time of its formation, Kerry Bros. was owned equally by petitioners. On December 29, 1975, petitioners each transferred by gift a 16⅔-percent interest in Kerry Bros. to separate but identical irrevocable inter vivos trusts (trusts) established for the benefit of their respective children. As a result of the transfer, and pursuant to the partnership agreement, each trust was allocated 16⅔ percent of Kerry Bros.' net profits and losses.[3]

Kerry Bros. was formed to hold legal title to equipment used by Kerry Coal in its mining operations. Kerry Coal had been engaged in deep mining for "quite a few years," and was unable to obtain insurance covering its potential liability under recently enacted black lung legislation. Additionally, the volatility of the coal mining industry and the cost of complying with pollution control requirements made the minimizing of assets held by Kerry Coal imperative. Consequently, petitioners were advised to form a separate entity as a repository for the title to assets utilized by Kerry Coal. Allocation of the investment credit resulting from the purchase of qualified property by either Kerry Coal or Kerry Bros. was not discussed at the time Kerry

---

[3]For its taxable year ending Dec. 31, 1975, Kerry Bros. allocated 16⅔ percent of the partnership's net income for the entire calendar year to each trust. Respondent subsequently reallocated all of the distributive share of Kerry Bros.' 1975 income reported by the trusts to petitioners, except for the proportionate net income of the partnership attributable to the last 3 days of 1975. Petitioners concede the correctness of this adjustment.

Bros. was formed, and did not impact on the decision to purchase and own equipment through the partnership.

During 1974, 1975, and 1976, Kerry Bros. purchased draglines, bulldozers, and other heavy equipment used to remove overburden and mine coal. The following amounts of new and used equipment were purchased by Kerry Bros. and leased to Kerry Coal in the years indicated:

| Year | Amount purchased | New or used property | Useful life years |
|------|------------------|----------------------|-------------------|
| 1974 | 147,872 | New | 7 or more |
| 1974 | 17,334 | Used | 5 or more but less than 7 |
| 1974 | 118,899 | Used | 7 or more |
| 1975 | 217,091 | New | 7 or more |
| 1975 | 91,380 | Used | 5 or more but less than 7 |
| 1976 | 219,010 | New | 7 or more years |
| 1976 | 43,000 | Used | 7 or more years |

Kerry Bros. reported both the new and used equipment as property qualifying for the investment credit on its original return for the year in which the property was purchased. Consequently, petitioners claimed as a distributive share from Kerry Bros. an investment credit based upon their pro rata interest in the qualified investment property.[4]

Petitioners retained the accounting firm of Carbis Walker & Associates (Carbis Walker) of New Castle, Pennsylvania, as tax counsel. Petitioners relied upon Thomas J. Donovan (Donovan), a certified public accountant and senior partner with Carbis Walker, for the preparation of their personal, partnership, and corporate returns. Donovan was first employed by Carbis Walker in 1947, and had worked with petitioners' father and Kerry Coal since the late 1940's. The returns were prepared by a manager at Carbis Walker prior to being reviewed and signed by Donovan. Donovan would then submit the returns to petitioners for their signature. At the time he reviewed Kerry Bros.' 1974, 1975, and 1976 returns, Donovan believed that the investment credit resulting from the purchase of qualified property could be passed from the partnership to petitioners as partners.[5] Petitioners

[4]For 1974, petitioners divided the amount of qualified property equally. For 1975 and 1976, petitioners each claimed a one-third interest in the qualified property, with the remaining one-third being claimed by the trusts.

[5]The trusts would subsequently be entitled to one-third of the credit after having acquired an interest in the partnership.

did not know that claiming the investment credit as partners of Kerry Bros. rather than as shareholders of Kerry Coal was impermissible until informed of this by Donovan subsequent to the commencement of the audit.

An audit of petitioners, Kerry Coal, and Kerry Bros. was begun by respondent no later than July 12, 1977. Pursuant to the audit, respondent disallowed petitioners' distributive share of Kerry Bros.' investment in property qualifying for the investment credit. Petitioners concede that they were not entitled to the reported distributive share of investment credit from Kerry Bros. for the years in issue by operation of the restrictions imposed upon noncorporate lessors of property by section 46(e)(3).[6]

Subsequent to commencement of the audit, Donovan contacted the law firm of Kirkpatrick, Lockhart, Johnson & Hutchison regarding the feasibility of making an untimely investment credit passthrough election. Donovan was advised by the firm to file amended partnership and corporate returns reflecting the election. Consequently, Donovan contacted petitioners and informed them that Kerry Bros. and Kerry Coal would have to file amended returns for 1974, 1975, and 1976. It was at this time that petitioners first learned of the prohibition against claiming investment credits by noncorporate lessors.

Kerry Bros.' and Kerry Coal's amended returns for the years in issue were prepared by Carbis Walker and signed by Donovan in January 1978. Donovan then submitted the returns to petitioners, who filed them with respondent on or about February 13, 1978. The amended returns included a

---

[6] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

Sec. 46(e)(3) provides as follows:

(3) NONCORPORATE LESSORS.—A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if—

(A) the property subject to the lease has been manufactured or produced by the lessor, or

(B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property.

In the case of property of which a partnership is the lessor, the credit otherwise allowable under section 38 with respect to such property to any partner which is a corporation shall be allowed notwithstanding the first sentence of this paragraph. For purposes of this paragraph, an electing small business corporation (as defined in section 1371) shall be treated as a person which is not a corporation.

general election to transfer the investment credit from Kerry Bros. as lessor to Kerry Coal as lessee. In the amended returns, Kerry Coal claimed a credit for both new and used equipment purchased by Kerry Bros. Petitioners concede that they are not entitled to claim an investment credit for used property pursuant to section 48(d).[7]

OPINION

The first issue for decision is whether Kerry Bros. is entitled to make a late section 48(d) election for the years 1974, 1975, and 1976, thereby enabling the partnership as lessor to pass the investment credit through to Kerry Coal as lessee.

Pursuant to section 48(d)(1),[8] a lessor of new section 38 property may elect to treat the lessee as the purchaser of such property for purposes of the investment credit. By making an election, the lessor passes the investment credit through to the lessee. As stated in the Committee report, "Permitting the investment credit to be passed on to the lessee in these cases is believed to be desirable since, as a result of this provision, it is possible for the lessor to pass the benefit of the investment credit on to the party actually generating the demand for the investment." S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 703, 725. Thus, pursuant to a valid election, the lessee is treated as the purchaser of qualified property and is entitled to the resulting investment credit.

To make a valid passthrough election, section 48(d)(1) requires that the lessor make the election "at such time, in such manner, and subject to such conditions as are provided by regulations prescribed by the Secretary or his delegate." Pursuant to said legislative mandate, section 1.48-4(a)(1),

---

[7]Respondent concedes that, if petitioners are allowed to make a sec. 48(d) election, petitioners will each be entitled to an investment credit with respect to one-half of the new qualified property purchased by Kerry Bros. during Kerry Coal's fiscal years ending Sept. 30, 1974, 1975, and 1976.

[8]SEC. 48(d). CERTAIN LEASED PROPERTY.—

(1) GENERAL RULE.—A person (other than a person referred to in section 46(e)(1)) who is a lessor of property may (at such time, in such manner, and subject to such conditions as are provided by regulations prescribed by the Secretary or his delegate) elect with respect to any new section 38 property (other than property described in paragraph (4)) to treat the lessee as having acquired such property for an amount equal to—

(A) except as provided in subparagraph (B), the fair market value of such property, * * *

Income Tax Regs., allows a lessor to treat a lessee as the purchaser of property if the following conditions are satisfied:

(1) The property must be "section 38 property" in the hands of the lessor;

(2) The property must be "new section 38 property";

(3) The original use of the property must commence with the lessor;

(4) The property would constitute "new section 38 property" to the lessee if the lessee had actually purchased the property;[9]

(5) The lessor must not be a person referred to in section 46(d)(1); and

(6) A statement of election to treat the lessee as a purchaser must be filed within the time and in the manner prescribed by regulation.

The time, manner, and conditions for filing a statement of election are prescribed in section 1.48-4(f) and (g), Income Tax Regs. The election may be made on a property-by-property basis or as a general election applicable to all properties transferred to the lessee by the lessor during the taxable year. The election statement must be signed by both the lessor and the lessee, and the lessee's signature will be deemed to constitute his consent to the election. The statement of election must be filed with the lessee on or before the due date (including extensions) of the lessee's return for the year in which possession under the lease was transferred. Once filed with the lessee, the statement of election is irrevocable for the taxable year of the lessee with respect to which the election is made.

In making either a property-by-property or a general election, the statement of election shall provide: (1) The name, address, and taxpayer account number of the lessor and the lessee, and (2) the District Director's Office with which the income tax returns of the lessor and lessee are filed. Additionally, in making a property-by-property elec-

---

[9]For purposes of sec. 48(d), the lessor and the lessee may both be considered the original users of an item of leased property. A determination of whether the lessee qualifies as the original user of leased property is made as if the lessee actually purchased the property. Sec. 1.48-4(b), Income Tax Regs.

tion, the statement of election must provide the following information:

(1) A description of each property with respect to which the election is being made;

(2) the date on which possession of the property is transferred to the lessee;

(3) the estimated useful life category of the property in the hands of the lessor; and

(4) the amount for which the lessee is treated as having acquired the leased property.

Both the lessor and the lessee must keep as part of their records the statement or statements required in connection with their election. Finally, the lessor must attach to his income tax return a summary statement of all leased property for which he has elected to pass through the credit indicating the lessor's and lessee's names, addresses, and taxpayer account numbers; the estimated useful life category of the property; and the basis or fair market value of the property.

Petitioners concede that Kerry Bros. did not file a timely statement of election pursuant to section 48(d), but contend that they should not be precluded from the benefits of making a passthrough election when the partnership's original reporting position represented an impermissible method of claiming the investment credit.

Petitioners rely on *Mamula v. Commissioner*, 346 F.2d 1016 (9th Cir. 1965), revg. and remanding 41 T.C. 572 (1964), in which the taxpayer initially reported gain from the sale of real property on an "open transaction" basis, whereby no gain was recognized until payments equal to the cost of the property sold had been recovered from the purchasers. The Commissioner disallowed the taxpayer's use of the "open transaction" method, and determined a deficiency for the year of sale based upon the "closed transaction" method, thus requiring that the entire profit from the sale be reported and the tax paid thereon in the year the sale was consummated. The taxpayer conceded that the "open transaction" method was impermissible, and requested to report the income under the installment method provided for in section 453. In *Mamula*, we held that the

taxpayer's use of the "open transaction" method constituted an election not to use the installment method, and was inconsistent with the taxpayer's subsequent attempt to make a section 453 election. Additionally, we found that the taxpayer failed to comply with the regulations applicable to making an installment sales election. Consequently, we sustained the Commissioner's refusal to permit the taxpayer to use the installment method in recalculating his tax liability.

In reversing our decision, the Ninth Circuit concluded that a taxpayer could not be bound by the election of an impermissible method of reporting income, stating as follows: "The present case does not involve an election by a taxpayer to which he is conclusively bound. Indeed, the taxpayer could not be bound by his election for it was a nonallowable choice—it was not allowable and not allowed. No one was bound." *Mamula v. Commissioner, supra* at 1018. Additionally, the Ninth Circuit found that the taxpayer's failure to comply with the section 453 regulations did not preclude a retroactive election of the installment method. This latter holding was explained as follows:

The Regulations in question cannot be construed to apply in an instance where the taxpayer has not chosen the installment method in the year of sale, but had subsequently been permitted to elect it when the method originally elected has been determined to be invalid. The Regulations can only be reasonably construed as applicable where the taxpayer does elect the installment method in the year of sale; if he so elects, the Regulations set out the nature of the schedules that must be attached to that year's income tax return. * * * [*Mamula v. Commissioner, supra* at 1019.]

Petitioners assert that, as in *Mamula*, this is not an instance where they have made an election of one of alternative permissible methods for claiming the investment credit, but rather that the choice made was an impermissible one and therefore is not binding. Additionally, petitioners argue that a literal application of section 1.48-4, Income Tax Regs., would produce an inequitable and unfair result which is contrary to and in conflict with legislative intent. Petitioners maintain that regulations establishing time limits for administrative convenience should not be construed as placing strict time constraints on a passthrough election

where the lessor mistakenly, but in good faith, improperly claims the investment credit.

We find *Mamula* and the section 453 installment sales provisions at issue therein to be readily distinguishable from the facts and law before us. While this Court has recognized that a taxpayer may be entitled to elect the installment method subsequent to filing his tax return for the year of sale when the taxpayer's original choice of reporting income from the sale was an impermissible method (see *Wierschem v. Commissioner*, 82 T.C. 718, 723 (1984)), and cases cited therein, these cases do not stand for the broad proposition that the making of an impermissible election per se entitles a taxpayer to make a late election. Rather, the late election permitted in *Mamula* reflects the statute, regulations, and administrative burdens uniquely at issue therein.

Sections 453 and 48(d) are fundamentally different in intent and execution. The installment sales provisions enable a taxpayer to report a portion of each dollar of sales proceeds received as a tax-free recovery of cost with the balance reported as profit. A single taxpayer is involved in making a section 453 election, the election is made on the taxpayer's return for the year of sale, and only the computation of gross profit on the sale need be reported.[10] A section 48(d) passthrough election, however, involves at least two taxpayers—the lessor and the lessee; the election is filed by the *lessor* with the *lessee* rather than with the Commissioner; and copious information must be provided in the statement of election as to the nature of the qualified property and the details of the leasing arrangement. Thus, section 48(d) is not simply an administrative provision, but rather is intended to coordinate the reporting positions of the numerous taxpayers affected by a passthrough election.

This difference in statutory intent is reflected in the regulations implementing the respective provisions. Pursuant to section 453(b), which provides that the installment method of reporting may be used "under regulations

---

[10] For any subsequent taxable year in which the taxpayer receives payments attributable to the sale, he must show in his return the computation of the amount of income which is being reported in that year on such sale.

prescribed by the Secretary or his delegate," the applicable regulations require that:

one who elects to report the income therefrom on the installment method must set forth in his income tax return (or in a statement attached thereto) for the year of the sale or other disposition the computation of the gross profit on the sale or other disposition under the installment method. * * * [Sec. 1.453-8(b), Income Tax Regs.]

In contrast, section 48(d) requires that a passthrough election be made "at such time, in such manner, and subject to such conditions as are provided by regulations." The regulations require the making of a general or specific election, the filing of an election statement by the lessor with the lessee, and a determination as to whether the property constitutes "qualified property" in the hands of both the lessor and lessee. This significantly greater regulatory specificity is required by legislative mandate and by the demands of coordinating potentially conflicting reporting positions. Congress expressly delegated enforcement of the section 48(d) election provision to the Secretary. We find that the requirements of section 1.48-4(f) and (g), Income Tax Regs., are necessary for the administration and enforcement of this provision, are consistent with congressional intent, and are entirely reasonable.

Additionally, the administrative burdens involved in making a late section 48(d) election are significantly greater than those in *Mamula* and other section 453 cases. *Mamula* involved only the first year of a single taxpayer's reporting position. By definition, the section 48(d) passthrough election involves at least two taxpayers, and in this instance, it involves five taxpayers over a period of 3 years.[11] Neither Kerry Bros. as lessor nor Kerry Coal as lessee is before the Court.[12] Furthermore, the investment credit was originally claimed by the partnership for both new and used property, whereas section 48(d) allows a credit for only "new section 38 property." Thus, we consider the administrative burdens that would be incurred by respondent, and the uncertainty

---

[11]It is unclear from the record whether the trusts actually claimed the investment credit initially allocated to them and, if so, whether this credit was subsequently disallowed on audit.

[12]We recognize that Kerry Bros. and Kerry Coal have filed amended returns reflecting the late election.

of ascertaining the correct tax liability of the affected parties, to weigh against allowing a late election.

Petitioners have cited *Maid-Rite Steak Co. v. United States*, 643 F. Supp. 1162 (M.D. Pa. 1986), as authority for applying the *Mamula* rationale to a section 48(d) election. On facts similar to those before us now, the court in *Maid-Rite* stated as follows:

Having mistakenly selected an impermissible avenue in good faith, the plaintiffs should not be precluded from selecting the permissible method, *viz.*, passing through the investment tax credit to Maid-Rite, the lessee.

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

* * * plaintiffs cannot be held to have made a binding irrevocable election by having erroneously and in good faith claimed the investment tax credit themselves. The [plaintiff's] "election" to claim the investment tax credit personally was an impermissible choice and therefore, they cannot be considered to have made a binding election.

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

In conclusion, this court finds that plaintiffs were not bound by the decision to claim the tax credit because that "election" was an impermissible and nonallowable choice. * * * [*Maid-Rite Steak Co. v. United States, supra* at 1167-1172. Fn. ref. omitted.]

We disagree with the result reached in *Maid-Rite*. The issue is not whether the taxpayer was bound by an impermissible election, but rather, whether the taxpayer was entitled to make a late election. The permissibility of a late election depends upon the statute, regulations, and administrative burdens specifically at issue. As discussed above, section 453 is readily distinguishable from section 48(d); therefore, the permissibility of a late election in *Mamula* has no bearing on the permissibility of a late election on the facts before us.

Consequently, we find neither *Mamula* nor *Maid-Rite* to be controlling, and decline to extend the late election exception articulated therein to the statute and regulations implementing the investment credit passthrough election.[13]

Petitioners next contend that claiming the investment credit as a passthrough from Kerry Bros. constitutes substantial compliance with the election provisions of sec-

---

[13]Our review of other cases cited by both petitioners and respondent confirms our conclusion that a late passthrough election would violate the intent of sec. 48(d) and the regulations promulgated thereunder.

tion 48(d). Petitioners reason that, because Kerry Bros. and Kerry Coal are related entities and were owned equally by petitioners for the majority of the time at issue,[14] the election to pass the investment credit through from the partnership to the corporation should be considered only a procedural formality in allowing the credit to be taken by petitioners. Furthermore, petitioners maintain that the investment credit resulting from the purchase of any property used by Kerry Coal, whether purchased by the partnership and leased to the corporation or purchased directly by the corporation, would flow through to the individual petitioners as a distributive share item from either the partnership or the corporation.

Respondent asserts that the partnership's claiming of the credit on its return is inconsistent with the passing through of the credit from Kerry Bros. as lessor to Kerry Coal as lessee. Additionally, respondent argues that section 1.48-4, Income Tax Regs., is a legislative regulation having the force and effect of law, and that the manner of making the election as prescribed in the regulations must be followed precisely. In conclusion, respondent maintains that in those cases where the substantial compliance doctrine was applied, the taxpayers' intent to make the election was clear from the beginning, the taxpayers made a reasonable effort to comply with the election requirements of the regulations, and no action inconsistent with the claimed election was taken. We agree with respondent that the partnership failed to comply substantially with either the statutory intent or the regulatory requirements of section 48(d).

The test for determining the applicability of the substantial compliance doctrine was set forth by this Court in *Taylor v. Commissioner*, 67 T.C. 1071, 1077-1078 (1977), wherein we stated the following:

The critical question to be answered is whether the requirements relate "to the substance or essence of the statute." *Fred J. Sperapani*, 42 T.C. 308, 331 (1964). If so, strict adherence to all statutory and regulatory requirements is a precondition to an effective election. *Lee R. Dunavant*, 63 T.C. 316 (1974). On the other hand, if the requirements are procedural or directory in that they are not of the essence of the thing to be done

---

[14]Petitioners each owned 50 percent of Kerry Bros. and Kerry Coal during all of 1974 and through Dec. 29, 1975, at which time they transferred one-third of their interest in the partnership to the trusts for the benefit of their children.

but are given with a view to the orderly conduct of business, they may be fulfilled by substantial, if not strict, compliance. See *Lee R. Dunavant*, *supra*; *Georgie S. Cary*, 41 T.C. 214 (1963); *Columbia Iron & Metal Co.*, 61 T.C. 5 (1973). * * *

See *American Air Filter Co. v. Commissioner*, 81 T.C. 709, 719 (1983); *Tipps v. Commissioner*, 74 T.C. 458, 468 (1980). As discussed above, we have found that the regulatory requirements for making an election are essential to coordinate the reporting positions of the lessor, the lessee, and other affected parties. Thus, noncompliance with the regulations would make a passthrough election unworkable.

The purpose and intent of section 48(d) is to allow the lessor to pass the benefit of the investment credit through to the lessee, who is actually responsible for having generated the demand for the investment. Thus, the essence of a section 48(d) election is that the lessee, and not the lessor, claims the investment credit. Petitioners violated the essence of section 48(d) by failing to pass the investment credit through to Kerry Coal. We are not faced with a situation where the investment credit was passed through to the lessee, but a timely election under the regulations was not made. In this instance, the lessor actually took the credit. There was neither the intent nor an attempt to pass the investment credit through to Kerry Coal. Petitioners would have us disregard the fact that Kerry Bros. and Kerry Coal are separate entities, and would rather have us focus on the fact that the credit would flow through either the lessor or the lessee to petitioners. We consider the fact that petitioners would ultimately benefit from the credit in either instance to be irrelevant. Petitioners chose the form of their business venture for legitimate business reasons; they did not want to expose all of their assets to liability by virtue of having them owned by Kerry Coal. Had petitioners chosen to operate from a single corporate entity, no election would have been necessary. They chose to operate from two separate entities and we respect that choice. Petitioners' claiming of the credit through Kerry Bros. rather than Kerry Coal strikes at the very heart of the passthrough election provisions.

We conclude that this is not an appropriate case for the application of the substantial compliance doctrine in that

petitioners violated the very essence of section 48(d)—the credit was retained by the lessor rather than passed through to the lessee—and failed to comply with the regulations concerning the time, manner, and conditions for making a passthrough election. We agree with the Seventh Circuit's decision in *Illinois Valley Paving Co. v. Commissioner*, 687 F.2d 1043, 1046 (7th Cir. 1982), affg. a Memorandum Opinion of this Court, wherein the Court stated as follows:

> Congress expressly conditioned transfer of the investment tax credit from lessor to lessee upon the lessor making an election in accordance with regulations prescribed by the Secretary or his delegate. The Secretary subsequently promulgated reasonable regulations regarding the form and timing of the election. The regulations are not so burdensome that we can engraft our own exceptions upon them whenever it may appear the Congressional purpose of motivating capital investment will be disserved. Congress delegated such power to the Secretary, not to us. Since the [taxpayer] has failed to comply with the conditions precedent to allowance of the credit, we must affirm.

Finally, petitioners contend that, because the time for making a section 48(d) election is not expressly prescribed by statute, they are entitled to an extension of time for making the election pursuant to section 1.9100-1, Income Tax Regs. Petitioners assert that Donovan's oral request to make a late election, in conjunction with the filing of Kerry Bros.' and Kerry Coal's amended returns, constitutes a request for an extension of time. Respondent contends that petitioners failed to submit a formal request for the extension of time with the Commissioner, that the necessary information and representations were lacking, and that an extension should therefore be denied. We decide this issue for respondent.

The Commissioner has discretion to grant a reasonable extension of time for the making of an election pursuant to section 1.9100-1, Income Tax Regs., which provides as follows:

Extension of time for making certain elections.

(a) *In general.* The Commissioner in his discretion may, upon good cause shown, grant a reasonable extension of the time fixed by the regulations in this chapter for the making of an election or application for relief in respect of tax under subtitle A of the Code provided—

(1) The time for making such election or[15] application is not expressly prescribed by law;

(2) Request for the extension is filed with the Commissioner before the time fixed by the regulations for making such election or application, or within such time thereafter as the Commissioner may consider reasonable under the circumstances; and

(3) It is shown to the satisfaction of the Commissioner that the granting of the extension will not jeopardize the interests of the Government.

For purposes of this section, an application for an extension of time for filing a return under section 6081 is not an application for relief in respect of tax.

Factors which will be taken into consideration in determining whether good cause to grant a request for an extension are set forth in Rev. Proc. 79-63, 1979-2 C.B. 578, as follows:

(1) Due diligence of the taxpayer;
(2) Prompt action by the taxpayer;
(3) Intent of the taxpayer;
(4) Prejudice to the interest of the Government;
(5) Statutory and regulatory objectives.

The request for an extension must contain information which is specifically responsive to each of the questions set forth above. Additionally, the request should include a chronological account of the events leading to the taxpayers' failure to make the election and affidavits or statements concerning those events from all persons having knowledge or information about the election. Finally, the requests must be accompanied by a declaration, made under penalties of perjury, stating that the facts presented in the request are true, correct, and complete.

As of the time of trial, petitioners had failed to file a request for an extension as mandated by section 1.9100-1, Income Tax Regs., and Rev. Proc. 79-63, *supra*. Donovan's oral request to make a late election and his subsequent filing of amended returns for Kerry Bros. and Kerry Coal did not constitute a formal request for an extension of time to make an election as contemplated by section 1.9100-1, Income Tax Regs. Respondent was provided with neither

---

[15]Respondent concedes that the time for filing an election under sec. 48(d) can be extended if the requirements prescribed by sec. 1.9100-1, Income Tax Regs., are satisfied. See Rev. Rul. 79-414, 1979-2 C.B. 21; Rev. Rul. 79-415, 1979-2 C.B. 22.

the information nor the representations necessary to make a determination as to the propriety of granting an extension. Petitioners' failure to formally request an extension, like petitioners' failure to timely make a passthrough election, reflects a lack of due diligence. It is neither respondent's nor this Court's responsibility to rescue ill-advised taxpayers from the perils of failing to comply with clear statutory and regulatory requirements. Consequently, we hold that petitioners are not entitled to an extension of time for making a passthrough election.

*Decisions will be entered under Rule 155.*