GERALD L. AND SHIRLEY A. TURNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Turner v. Commissioner
Docket No. 3659-88
United States Tax Court
T.C. Memo 1995-363; 1995 Tax Ct. Memo LEXIS 359; 70 T.C.M. (CCH) 289; August 2, 1995, Filed *359 Decision will be entered pursuant to Rule 155. For petitioners: Gino Pulito. For respondent: John Aletta. ARMEN
ARMEN
MEMORANDUM FINDINGS OF FACT AND OPINION ARMEN, Special Trial Judge: This case was assigned pursuant to the provisions of section 7443A(b) and Rules 180 et seq. [1]
Respondent determined deficiencies in, and additions to, petitioners' Federal income taxes for the taxable years 1980 and 1983 as follows: Additions to Tax
Sec. Sec.
Sec.
Sec. Year
Deficiency
6653(a)
6653(a)(1)
6653(a)(2)
6659(a)
1980
$ 8,591
$ 430
--
--
$ 2,577
1983
3,625
--
$ 181
[1] 498
Respondent also determined that petitioners are liable for the increased *360 rate of interest under section 6621(c), formerly section 6621(d), for each of the taxable years in issue. Petitioners have conceded the deficiencies in income tax. Accordingly, the only issues for decision are whether petitioners are liable for: (1) Additions to tax for negligence under sections 6653(a), 6653(a)(1), and 6653(a)(2); (2) additions to tax under section 6659(a) for a valuation overstatement; and (3) the increased rate of interest under section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated, and they are so found. At the time that the petition was filed, petitioners resided in Elyria, Ohio. Petitioner Gerald L. Turner (petitioner) is a high school graduate. He also completed one semester of college. Petitioner Shirley A. Turner (Mrs. Turner) is also a high school graduate. Additionally, Mrs. Turner attended secretarial school. Petitioners have no specialized training in either accounting or taxation; however, before 1983, petitioner generally prepared petitioners' own income tax returns. Prior to 1983, petitioner had invested [2] in various stocks and mutual funds through a stockbroker. In making those investments, petitioner relied on the advice of *361 the stockbroker. Some of these investments produced profits, while others simply broke even. Through professional colleagues, petitioner learned of Graham & Associates, Inc. (Graham & Associates) and its president, Thomas Graham (Graham). On his first visit to Graham & Associates, in December 1983, petitioner met with Graham's brother, John Graham, to discuss possible long-term investments. Petitioner expressed his reservations about becoming involved in any investment which would require him to play an active management role or which would subject him to liability beyond the initial investment. At that time, John Graham provided information to petitioner regarding Saxon Energy Corp. (Saxon). Saxon was a corporation formed in 1981 to lease energy management systems, such as the Energy Brain/Fuel Optimiser System A-1 (the Energy Brain System), to the public. See Schillinger v. Commissioner, T.C. Memo. 1990-640, *362 affd. per order 1 F.3d 954 (9th Cir. 1993)(discussing the Saxon Energy program in some detail). Petitioners had no experience or knowledge with respect to the acquisition, lease, production, installation, marketing, or use of energy management systems during the taxable years in issue. Before deciding to invest in Saxon, petitioner received from Graham & Associates several documents relating to Saxon, including a copy of the Saxon Energy Corp. Energy Brain/Fuel Optimiser Equipment Leasing Program Information Memorandum (the Information Memorandum) and a document entitled "Frequently Asked Questions About the Energy Brain/Fuel Optimiser Equipment Leasing Program". These documents contained limited information regarding the energy management systems and a comparatively extensive amount of information regarding the potentially favorable tax consequences of leasing such a system. Petitioners also received from Graham & Associates a copy of a 1-1/2 page letter from Charles Taylor (Taylor) to Saxon indicating his opinion that the Energy Brain System's fair market value was $ 205,000. The letter, dated June 13, 1983, included a "vita criteria" providing limited *363 information regarding Taylor's credentials. Petitioners obtained no appraisal, other than the foregoing, of the value of the Energy Brain System. Although petitioner did review the documents provided to him by Graham & Associates, neither he nor Mrs. Turner conducted any independent investigation regarding either the expertise of Graham & Associates or the viability of their prospective investment in the Energy Brain System. Moreover, petitioners never asked any third party to review the Information Memorandum or other Saxon documents on their behalf before undertaking to lease an Energy Brain System from Saxon. Rather, petitioner relied entirely on the representations of John Graham regarding the Saxon lease. Petitioner understood that in order to receive tax benefits from an investment in the Energy Brain System in 1983, a payment would have to be made prior to the end of the taxable year. On December 28, 1983, an Agreement of Lease (the lease) was entered into by petitioner as lessee and Saxon as lessor. The lease involved a one-half interest in the Energy Brain System. The other one-half interest in the Energy Brain System was leased by Barbara J. Kiehl (Kiehl), as part of *364 a joint venture with petitioner. The term of the lease was 20 years. Under the terms of the lease, petitioner was required to pay an advanced guaranteed rental for the period December 31, 1983 through December 31, 1984 in the amount of $ 6,750 for his one-half interest in the Energy Brain System. On or about December 28, 1983, an Election to Pass Investment Tax Credits from Lessor to Lessee was signed by petitioner. Petitioner did not intend to use the Energy Brain System himself. Instead, petitioner planned to engage a management company, which would locate an end-user. The end-user would pay for the Energy Brain System by sharing equally the amount of energy savings with petitioner. The management company was to retain a fee of 15 percent of petitioner's share of the energy savings and remit the balance to petitioner. Petitioner was then required to pay Saxon 75 percent of the remaining net income. Petitioner never negotiated the amount of the lease payment to Saxon. Petitioner never inspected, and has never seen, the Energy Brain System that he leased from Saxon. Petitioner entered into a service agreement (the service agreement) with ALH Energy Management Corp. (ALH) as the *365 management company for the Energy Brain System on December 28, 1983. Petitioner relied upon Saxon to select ALH as the management company. By letter dated July 18, 1984, K.M. Fereg of ALH notified petitioner that the Energy Brain System had been placed in service in December 1983. The location of the Energy Brain System was identified in that letter as the St. Peter & Paul Parish (Roman Catholic) in Springfield, Illinois. After entering into the lease, communications between petitioner and Graham regarding petitioners' investment in the Energy Brain System related primarily to concerns about the viability of the investment as a tax shelter. Susan Haselhorst (Ms. Haselhorst) is an expert in the fields of energy management systems, design engineering evaluation methods, and energy system modeling. She prepared a study for respondent entitled "An Assessment of the Fair Market Value and the Profit Potential of the Energy Brain 1983A, 1 through 4" (the Study). The preparation of the Study took 120 hours and utilized four experts who hold degrees in areas such as engineering and accounting. The cost of conducting the Study was approximately $ 15,000. In evaluating the fair market value *366 and the profit potential of the Energy Brain System, Ms. Haselhorst considered, among other things, the Information Memorandum and other promotional literature, the terms of the lease entered into by petitioner and Saxon, and publicly available trade catalogues and magazines. She also had an opportunity to examine an Energy Brain/Fuel Optimiser System A-1, as well as energy management systems being marketed by other companies. On the basis of the Study, Ms. Haselhorst concluded that the fair market value of the Energy Brain System did not exceed $ 795. She also concluded, on the basis of the Study, that over a 10-year period an individual leasing the Energy Brain System would incur an economic loss of $ 50,000. Finally, she concluded that Without the substantial tax benefit of the investment tax credit based on the Saxon Energy evaluation of worth, the taxpayer can only lose money on the Saxon Energy lease arrangement under the terms of the lease and over the reasonable life of the equipment.
Petitioners do not dispute these conclusions. We think the conclusions are supportable, and we adopt them as our own. See Schillinger v. Commissioner, T.C. Memo. 1990-640. *367 During 1982 and 1983, there were many products comparable to the Energy Brain System being marketed due to the nation's energy conservation needs. Energy management systems were available at the retail level, for prices ranging from a few hundred dollars to hundreds of thousands of dollars. The variation in prices of energy management systems was the result of differences in the number of functions controlled by each such system. For example, a more elaborate system would control heating, air conditioning, lighting, and ventilation. Such a system would likely also serve other purposes, such as security, fire protection, and various monitoring functions. The Energy Brain System controlled only heating, a fact that was indicated in the Information Memorandum. Accordingly, it would properly have been considered a relatively low-end model. Petitioners timely filed their income tax returns for the taxable years 1980 and 1983. Petitioners attached to their 1983 income tax return, which was prepared by Graham, Form 3468 (Computation of Investment Credit). On that form, petitioners reported a value of $ 102,500 for their one-half interest in the Energy Brain System. On the basis of that *368 valuation, petitioners claimed an investment credit in the amount of $ 10,250. [3]
Petitioners also attached a Schedule C in respect of their Saxon investment to their 1983 return. On the Schedule C, petitioners claimed as deductions a number of expenses, including lease expenses of $ 6,750 and management fees of $ 338. Petitioners reported no gross receipts or sales in respect of the Saxon investment on the Schedule C. On a Form 1045, Application for Tentative Refund, filed with respondent, petitioners claimed an investment credit carryback pertaining to their Saxon investment to the taxable year 1980 in the amount of $ 8,591. [4]
*369 As previously indicated, petitioners concede the deficiencies in income taxes. We need therefore only decide whether petitioners are liable for: (1) Additions to tax for negligence; (2) additions to tax for a valuation overstatement; and (3) the increased rate of interest under section 6621(c). OPINION Petitioners bear the burden of proof as to each of the additions to tax and the increased rate of interest. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972). Negligence
We begin with the additions to tax for negligence, the primary issue in this case. Section 6653(a) for 1980 and section 6653(a)(1) for 1983 impose an addition to tax if any portion of an underpayment is due to negligence or intentional disregard of the rules or regulations. For 1983, section 6653(a)(2) imposes an addition to tax in an amount equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence. Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). *370 In order to prevail on the issue of negligence, petitioners are obliged to prove that their actions in connection with the Saxon transaction were reasonable in light of their experience and the nature of the investment. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). Within this framework, petitioners may prevail if they reasonably relied on competent professional advice. Freytag v. Commissioner, 501 U.S. 868 (1991). However, "Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered." Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). When considering the negligence addition, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers as well as the manner in which the taxpayers approached their investment. In this case, petitioners contend that their actions, particularly their reliance on Graham & Associates, were reasonable. Petitioners cite *371 Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, as authority for their position that their actions were reasonable. In our view, the evidence introduced simply does not support the conclusion that petitioners acted reasonably under the circumstances. Moreover, petitioners' reliance on Heasley v. Commissioner, supra, is misplaced, as petitioners' circumstances are different than those of the taxpayers in the Heasley case. The taxpayers in Heasley had only high school degrees and extremely limited investment experience. Moreover, the Court of Appeals for the Fifth Circuit indicated that the taxpayers in Heasley both intended to earn an economic profit on the investments in issue and actively monitored that investment. Although petitioners have educational backgrounds similar to those of the taxpayers in Heasley v. Commissioner, supra, petitioners had some investment experience prior to 1983. Moreover, the evidence falls short of demonstrating that petitioners had an interest in earning an economic profit on the *372 Energy Brain System. Although petitioner did review the documents provided to him by Graham & Associates, neither he nor Mrs. Turner conducted any independent investigation regarding either the expertise of Graham & Associates or the viability of the proposed investment in the Energy Brain System. The information provided to petitioners by Graham & Associates contained limited information regarding the energy management systems and a comparatively extensive amount of information regarding the potentially favorable tax consequences of leasing such a system. Petitioners had no experience or knowledge with respect to the acquisition, lease, production, installation, marketing, or use of energy management systems during the taxable years in issue. The information they received was insufficient to indicate the profit potential of the investment they were considering. Petitioners' post-investment communications with Graham regarding the Energy Brain System did not constitute an effort to monitor their investment. Rather, on the basis of the evidence adduced at trial, we find that petitioners' post-investment communications with Graham related to concerns regarding the viability of the *373 Energy Brain System investment as a tax shelter. Petitioners have failed to persuade us that their actions in connection with their investment in the Energy Brain System were reasonable in light of their experience and the nature of their investment. Accordingly, we sustain respondent's determination with respect to the imposition of additions to tax for negligence. Valuation Overstatement
We turn now to the addition to tax for a valuation overstatement. Such an addition to tax may be imposed if an underpayment of tax attributable to a valuation overstatement equals or exceeds $ 1,000. Sec. 6659(a), (d). A valuation overstatement exists if the value of any property or the adjusted basis of any property claimed on a return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis. Sec. 6659(c)(1). In the event that the reported value exceeds 250 percent of the correct value, an addition to tax of 30 percent of the underpayment of tax attributable to such overstatement is imposed. Sec. 6659(b). Section 6659 does not apply, however, to underpayments of tax that are not attributable to valuation overstatements. Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), *374 affg. 89 T.C. 912 (1987)(where taxpayers were not entitled to claimed investment tax credits because property was not placed in service during the years in issue, the underpayment was not attributable to a valuation overstatement). On their 1983 income tax return, petitioners claimed a value of $ 102,500 for their one-half interest in the Energy Brain System. On the basis of that valuation, petitioners claimed an investment tax credit of $ 10,250 and utilized $ 4,066 of that amount to reduce their reported income tax liability (exclusive of the alternative minimum tax) for 1983 to zero. They also claimed as deductions a number of expenses relating to the Saxon investment, including lease expenses of $ 6,750 and management fees of $ 338. On a Form 1045, Application for Tentative Refund, filed with respondent, petitioners claimed an investment credit carryback pertaining to their Saxon investment to the taxable year 1980 in the amount of $ 8,591. On the basis of the Study, we have concluded that the fair market value of the Energy Brain System did not exceed $ 795. Therefore, petitioners' valuation of the Energy Brain System constitutes a valuation overstatement. *375 Sec. 6659(c)(1). We must now decide whether the deficiency in income tax for each of the taxable years in issue is attributable to the valuation overstatement. Sec. 6659(a); see, e.g., Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991), affg. T.C. Memo. 1990-205; Massengill v. Commissioner, 876 F.2d 616, 619-620 (8th Cir. 1989), affg. T.C. Memo. 1988-427; Todd v. Commissioner, supra; Urbanski v. Commissioner, T.C. Memo. 1994-384. [5]
Part of the deficiency for 1983, as well as the entire deficiency for 1980, *376 resulted from the disallowance of the investment tax credits claimed by petitioners with respect to their 1983 Saxon investment. Nonetheless, as discussed below, we hold that no part of the deficiency for either of the years in issue is attributable to the valuation overstatement because a valid election to transfer the investment tax credits from lessor to lessee was never executed. Sec. 48(d)(1); ; Todd v. Commissioner, supra; Kerry v. Commissioner, 89 T.C. 327 (1987); sec. 1.48-4(f), Income Tax Regs.
On or about December 28, 1983, petitioner executed a document entitled "Election to Pass Investment Tax Credits from Lessor to Lessee". This document, however, was not signed by any Saxon representative. Section 48(d)(1) provides, in relevant part: A person * * * who is a lessor of property may (at such time, in such manner, and subject to such conditions as are provided by regulations prescribed by the Secretary) elect * * * to treat the lessee as having acquired such property * * *.
The regulations (the Regulations) promulgated under section 48(d)(1) provide, also in relevant part: The election of a lessor with respect to a *377 particular property (or properties) shall be made by filing a statement with the lessee, signed by the lessor and including the written consent of the lessee, containing the following information: * * * [Sec. 1.48-4(f), Income Tax Regs.; emphasis added].
Although petitioner attempted to execute an election in accord with section 48(d), no Saxon representative signed the form entitled "Election to Pass Investment Tax Credits from Lessor to Lessee". In Kerry v. Commissioner, supra, the Court held that in the absence of strict compliance with the Regulations, a valid election to transfer the investment tax credit from lessor to lessee could not occur. Because the Regulations require that the lessor actually sign a statement electing to transfer the investment tax credit to the lessee, no valid election was made in this instance. Consequently, because petitioners' claimed investment tax credit is not allowable on the grounds that no valid election occurred, the underpayments resulting from the disallowance of the investment tax credits are not attributable to the valuation overstatement which exists for each of the years in issue. Sec. 6659(a); *378 Todd v. Commissioner, supra.
In view of the foregoing, we do not sustain respondent's determination that petitioners are subject to additions to tax under section 6659(a). We note, however, that "Congress is, of course * * * free to change the result in cases such as this by imposing additions to tax or additional interest on underpayments attributable to transactions 'accompanied by a valuation overstatement'". Todd v. Commissioner, 89 T.C. 912, 921-922 (1987), affd. 862 F.2d 540 (5th Cir. 1988). Increased Rate of Interest
Finally, section 6621(c) provides for an increased rate of interest with respect to any underpayment in excess of $ 1,000 which is "attributable to 1 or more tax-motivated transactions". Sec. 6621(c)(1) and (2). The increased rate of interest applies to interest accruing after December 31, 1984. See DeMartino v. Commissioner, 88 T.C. 583, 589 (1987), affd. 862 F.2d 400 (2d Cir. 1988)(the increased rate of interest applies to interest accruing after December 31, 1984, even though the transaction in question was entered into before *379 the date of enactment of section 6621(c)). Respondent determined that petitioner was liable for the increased rate of interest because the underpayments for the years in issue are attributable to tax-motivated transactions. Section 6621(c)(3)(A)(v) provides that the term "tax-motivated transaction" includes "any sham or fraudulent transaction". Economic shams, or transactions which lack economic substance, fall within the ambit of section 6621(c)(3)(A)(v). Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988). Petitioners introduced no evidence that the Saxon transaction was not an economic sham. Nevertheless, we are unable to sustain in full respondent's determination that petitioners are liable for the increased rate of interest under section *380 6621(c) with respect to the deficiencies for 1980 and 1983. Rather, we hold that petitioners are liable for the increased rate of interest only in respect of that portion of the underpayment for 1983 that is attributable to the disallowed Schedule C deductions. [6] Petitioners are not liable for the increased rate of interest for 1980 because the underpayment for that year is solely attributable to the disallowed investment credit. McCrary v. Commissioner, 92 T.C. 827, 857-860 (1989). Conclusion
In order to reflect our disposition of the disputed issues, as well as petitioners' concessions, Decision will be entered pursuant to Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 50 percent of the statutory interest due on the amount of the deficiency attributable to negligence, i.e., $ 3,625.↩
2. Throughout this Opinion, we use the term "invest" and all of its derivatives solely for the sake of convenience.↩
3. Of this amount, petitioners utilized $ 4,066 on their 1983 return in order to reduce their reported income tax liability (exclusive of the alternative minimum tax) for that year to zero. Petitioners reported alternative minimum tax in the amount of $ 2,407, which represented their total reported tax liability for 1983. Petitioners then claimed a refund in the amount of $ 18,727.↩
4. The sum of the investment credit claimed for 1983, $ 4,066, and the investment credit carried back to 1980, $ 8,591, equals $ 12,657, an amount in excess of the $ 10,250 claimed on Form 3468. Petitioners computed the unused investment credit available for carryback to 1980 as follows: ↩
1983 investment credit
$ 10,250
Less: amount claimed in 1983
-4,066
Balance
6,184
Plus: 1983 AMT reported
2,407
Unused ITC for carryback
8,591
5. Sec. 6659 applies to returns filed after Dec. 31, 1981. When an item carried back from a later year (such as 1983) to an earlier year (such as 1980 or 1981) is "attributable to" the adjustments in the later year, sec. 6659 may be applied to returns filed before Jan. 1, 1982. Nielsen v. Commissioner, 87 T.C. 779↩ (1986).
6. We assume that the portion of the underpayment for 1983 that is attributable to the disallowed Schedule C deductions exceeds $ 1,000, but we leave such matter to the parties as part of their Rule 155 computation.↩