NORMAN E. POWELL AND BARBARA POWELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Powell v. Commissioner
Docket No. 14749-82.
United States Tax Court
T.C. Memo 1986-369; 1986 Tax Ct. Memo LEXIS 242; 52 T.C.M. (CCH) 163; T.C.M. (RIA) 86369; August 11, 1986. Kenneth Zuckerbrot,Felice F. Mischele, and Robert J. Preminger, for the petitioners. Michael N. Balsamo and Gregg M. Weiss, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined a deficiency of $78,090.90 in petitioners' 1978 joint Federal income tax. The primary issue for decision is whether petitioners' license activities with respect *245 to "The Ultrasonic Plaque Control Instrument" were activities not engaged in for profit within the meaning of section 183. [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of fact and the exhibits attached thereto are incorporated herein by this reference. Petitioners resided in Plainview, New York when the petition herein was filed. Petitioner [2] is an intelligent individual who has received an extensive academic background as well as practical experience in law and commerce. Petitioner earned an undergraduate degree in accounting, a law degree, and a masters of business administration degree with concentration in finance and taxation. During the year 1978, petitioner was a self-employed attorney. Additionally, during such year, petitioner received wages from World Wide Venture Corporation ("World Wide"), a venture capital subsidiary of a large privately held corporation. Petitioner was a vice-president of World Wide who reviewed potential investments *246 as a real estate and venture capital consultant. During the year 1978, petitioner anticipated receipt of a substantial and nonrecurring fee with respect to a business transaction commenced during the previous year. Petitioner earned this fee in his capacity as legal and real estate consultant in the acquisition of an office building located in New York City by a European financial institution. Petitioner received such fee on October 24, 1978. In anticipation of the substantial fee, petitioner sought the investment advice of two business consultants: Peter R. Newman ("Newman"), an attorney and certified public accountant, and Stephen H. Deutsch ("Deutsch"), a certified public accountant. During the year 1978, Newman and Deutsch reviewed the Federal income tax consequences of approximately 50 prospective investments on behalf of petitioner. In October of 1978, Newman and Deutsch recommended that petitioner purchase an exclusive territorial license offered by Ultrasonic Plaque Control Laboratories, Inc. ("UPC") to market and to sell an Ultrasonic Plaque Control Instrument ("the toothbrush"). *247 The toothbrush was developed by Arthur Kuris. The toothbrush is similar to an electric toothbrush in appearance and operation except that the brush head stroke-rapidity of 27,000 oscillations per second purportedly removes plaque, whereas an electric toothbrush performs 40 to 60 oscillations per second. Petitioner met approximately six times with members of the law firm Schekter, Aber, and Hecht, P.C. ("the Schekter law firm") as such law firm represented UPC. The Schekter law firm furnished petitioner with the offering memorandum relating to the toothbrush license entitled "The Ultrasonic Plaque Control" Technique Information Memorandum Relating to Exclusive License Rights. The offering memorandum states that UPC intends to market the toothbrush through the dentist as opposed to the traditional retail distribution to insure the "appropriate professional image" and the "maximum credibility and serious consumer acceptance." The offering memorandum included a tax opinion written by the Schekter law firm. Petitioner also received with the offering memorandum the following pertinent documents entitled: I. "Ultrasonic Plaque Control - Average License Financial Illustrations" for *248 years ending December 31, 1978-1986 prepared by the accounting firm of Rose, Feldman, Radner, Parone, and Skehan ("the Feldman financial projection") II."Ultrasonic Plaque Control License Evaluation" purportedly prepared by C. Neil Jensen. ("the Jensen report") III. Effectiveness of an Ultrasonic Toothbrush in a Group of Unistructed Subjects" written by Dr. Henry M. Goldman and published in the Journal of Periodontology in February, 1974 ("the Goldman article") Steven Feldman ("Feldman") is a a certified accountant with the accounting firm Rose, Feldman, Radin, Parone & Skehan. Martin Hecht and Leon Schekter of the Schekter law firm engaged Feldman to prepare the Feldman financial projection which attempted to illustrate estimated average license financial operations. The projected figures for sales, cost of goods sold, sales commissions and all other expenses relevant to the projections were provided by the Schekter law firm. Feldman performed no independent auditing or verification procedures regarding any information upon which the projections were based. The Feldman financial projection assumed sales to commence during the year 1981. Feldman prepared a format Form 1040 *249 Schedule C to be used by all licensees but conducted no independent research or analysis as to the substance of the Schekter law firm tax opinion within the offering memorandum. Petitioner's business consultants, Newman and Deutsch did not contact Feldman. Feldman placed three clients in the UPC license arrangement and received compensation from UPC. Petitioner elected the accrual method of accounting concerning his UPC license activity. On his 1978 Form 1040 Schedule C petitioner deducted the following amounts: Advertising
$74,800.00
Legal and Professional Services
40,000.00
Amortization
22,222.00
Interest on Business Indebtedness
480.00
Selling Expenses
100.00
Office Expenses
15.00
$137,617.00
Respondent disallowed the entire amount within the statutory notice of deficiency. Neil Jensen ("Jensen") was associated with Lactona Corporation, the dental division of Warner Lambert Corporation. Jensen became aware of UPC during the year 1978. John Woodcock ("Woodcock") telephoned Jensen on behalf of UPC. Prior to 1978, Jensen had met Woodcock at various dental conventions. Jensen met twice with Woodcock on December 8 and 9, 1978 to discuss the potential *250 market for a plaque removal device. Jensen performed a limited analysis and located several dental articles in preparation for the meetings with Woodcock. Each meeting lasted about four hours and Jensen billed Woodcock for eight hours of services in the amount of $200.00. Jensen was not aware that UPC intended to license the toothbrush by territory. Jensen was not provided the Feldman financial projection, sales data, offering memorandum, or license agreement. Jensen was not contacted by petitioner or any of petitioner's consultants until March of 1984. The Jensen report dated November 17, 1978 and furnished to petitioner by UPC as a promotional item was not written or signed by Jensen. Dr. Henry M. Goldman ("Dr. Goldman") is a periodontist and professor at the Henry M. Goldman School of Graduate Dentistry at Boston University. Dr. Goldman is a noted periodontist who enjoys a reputation of high standing within the dental community. Dr. Goldman tested an ultrasonic toothbrush during the year 1972. The Boston University Graduate School of Dentistry was not involved in this research. Dr. Goldman's experimentation with an ultrasonic toothbrush was not extensive and was intended *251 to encourage research by other periodontists. In this regard Dr. Goldman published his research in the Journal of Periodontology in February of 1974. Dr. Goldman was unaware that UPC distributed the Goldman article to promote the sale of UPC licenses. In September of 1979, Dr. Goldman was informed by the Securities and Exchange Commission that UPC used the Goldman article and referred to his research within the UPC promotional material. An attorney hired by Dr. Goldman informed the Schekter law firm and UPC by letter dated October 24, 1979 to refrain from further reference or use of Dr. Goldman's name or research. The statements attributed to Dr. Goldman by UPC were exaggerated and generally untrue as well as unauthorized. Petitioner signed a license agreement dated December 21, 1978 with UPC. Petitioner, as licensee, agreed to pay UPC, as licensor, a license fee in total sum of $200,000 payable as follows: (a) The sum of $13,000 in cash or certified check (b) The sum of $12,000 by negotiable promissory note executed and delivered to licensor on or before February 1, 1979 with interest at the rate of seven percent per annum accompanied by an irrevocable letter of credit *252 ("the license fee recourse note") (c) The sum of $175,000 by non-recourse promissory note due January 1, 1986 ("the license fee nonrecourse note") The license fee nonrecourse note dated December 21, 1978 required quarterly payments of principal and interest determined by multiplying the number of toothbrushes sold and paid for during the prior calendar quarter by $5.00. As security for the license fee nonrecourse note, petitioner granted a security interest to UPC in the license, any inventory, and any amounts receivable. The license commenced on December 21, 1978 and will terminate on December 31, 1986. The license agreement included a renewal option of five years provided that petitioner exercised such option on or before December 21, 1983, tendered $12,500 cash payment and $37,500 nonrecourse promissory note. The UPC license agreement also provided that each licensee contribute the amount of $74,800 to the Advertising and Promotional Fund administered by Hanson, Fassler & Associates, Inc. ("Hanson Fassler"), an advertising concern, payable in the amount of $10,800 cash and $64,000 nonrecourse note ("the advertising nonrecourse note"). The advertising nonrecourse note required *253 quarterly payments of principal and interest determined by multiplying the number of toothbrushes sold and paid for by the sum of $2.00. The advertising nonrecourse note was secured by the same collateral that secured the license fee nonrecourse note. Herbert Fassler ("Fassler") of Hanson Fassler first learned in April of 1984 that under the UPC license agreement petitioner executed the advertising nonrecourse promissory note payable to the order of Hanson Fassler. Hanson Fassler billed UPC for actual work performed and costs incurred and payment was not dependent upon sales. Hanson Fassler terminated the relationship with UPC in 1982 but continued to makret an ultrasonic dental device. On December 21, 1978, petitioner executed an optional sales agency agreement for a term of one year with Dental Sales Consultants ("DSC") as "exclusive sales agent" for the toothbrush within petitioner's license territories. Woodcock signed the sales agency agreement on behalf of DSC. The sales agency agreement required payment in the amount of $1,200 cash upon the execution of the agreement and $1.00 for each toothbrush sold by the agent for which payment was received. Petitioner on December 29, 1978 executed *254 a nonrecourse note in the amount of $40,000 due on January 1, 1986 payable to Newman and Deutsch ("the tax advice nonrecourse note") in consideration of their review of the Federal income tax consequences of approximately 50 investments. The tax advice non-recourse note required quarterly payments of principal and interest in an amount determined by multiplying the number of toothbrushes sold and paid for by the sum of $5.00. The tax advice nonrecourse note was subordinate to the license fee nonrecourse note and the advertising nonrecourse note and no payment of principal or interest was due until such notes were paid in full. Petitioner did not sign the tax advice nonrecourse note. Dr. Herbert I. Oshrain ("Dr. Oshrain") has been a practicing periodontist since 1958 and was a professor at Columbia University Dental School. Dr. Oshrain conducted a clinical test on an ultrasonic toothbrush in 1973 under the auspices of Columbia University. The conclusion of Dr. Oshrain was that the ultrasonic toothbrush was no more effective that a manual toothbrush in the removal of plaque. Dr. Burton Wasserman ("Dr. Wasserman"), the Director of Dentistry at Booth Memorial Hospital, conducted *255 tests on the toothbrush but has not attained conclusive results. Dr. Wasserman and Fassler became acquainted during the year 1981. Dr. Wasserman conducted two series of tests during the years 1981 and 1983 regarding the toothbrush. In December of 1983, Fassler arranged to exhibit the toothbrush at the Greater New YorkDental Show ("the dental exhibition") under the auspices of Booth Memorial Hospital for which Fassler developed a promotional pamphlet for distribution. Fassler arranged for petitioner to attend the dental exhibition as a guest. UPC did not furnish any funds regarding the dental exhibition as the relationship between Hanson Fassler and UPC was terminated during 1982 because UPC lacked sufficient funds to continue the marketing efforts of Hanson Fassler. Even though the relationship between Hanson Fassler and UPC terminated in 1982, Hanson Fassler continued to develop a marketing strategy for the toothbrush.Fassler indicated that the dental device displayed at the dental exhibition may not be the toothbrush subject to petitioner's UPC license and that an ownership dispute between Arthur Kuris, the inventor of the toothbrush, and UPC existed in that regard. At the *256 time petitioner invested in his license territories, petitioner was advised that the toothbrush required further market research to determine an appropriate pricing structure and clinical testing for Food and Drug Administration ("FDA") approval. Petitioner was advised that the toothbrush could not be distributed for sale until 18 to 24 months from December of 1978. Petitioner applied for the necessary state documents such as a certificate to do business in Nassau County as the Normal E. Powell Hygiene Products Company and a sales tax license. Petitioner never maintained a separate bank account or separate books and records concerning his UPC license activities. During the years 1979 through 1982, petitioner corresponded with Joshua H. Weisberger, President of UPC and president of M.E.J. Management Corporation, an entity engaged by UPC to manage dental license operations in January of 1980. Petitioner initiated or received five items of such correspondence with Joshua H. Weisberger during 1979, two items during 1980, and one item during 1982. Petitioner maintained contemporaneous albeit cyptic, barely intelligible notes of his license activities which regarding the efforts of *257 Fassler and Joshua H. Weisberger regarding the marketing, manufacturing, and FDA problems of the toothbrush. OPINION The primary issue for decision is whether petitioners are entitled to deduct expenses attendant to the UPC territorial license activities. Respondent's disallowance of such expenses is premised upon the determination within the statutory notice of deficiency that petitioners' UPC license activities were not engaged in for profit within the meaning of section 183. In the alternative, respondent asserts that the nonrecourse notes executed by petitioner with regard to the UPC license were not bona fide indebtedness for tax purposes. Based upon our determinations herein, we need not address respondent's remaining alternative arguments. Respondent also determined within the statutory notice of deficiency that petitioners received $328.00 of unreported interest income. Respondent's determination is presumptively correct. Petitioners failed to satisfy the burden of proof as to such interest income. Rule 142(a). Section 183 is an allowance provision, rather than a disallowance *258 provision, which may operate to permit certain deductions for activities not motivated by profit. Brannen v. Commissioner,78 T.C. 471, 500 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Engdahl v. Commissioner,72 T.C. 659, 666 (1979). Section 183(a) provides in the case of an activity engaged in by an individual or electing small business corporation, that if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed except as provided within section 183(b). An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraphs (1) or (2) of section 212." If such activity is not engaged in for profit, section 183(b) separates the claimed deductions into two categories. Section 183(b)(1) allows deductions which are not dependent upon a profit motive. Section 183(b)(2) allows the balance of such deductions which would otherwise be permitted only if such activity was engaged in for profit limited to the extent that gross income derived from the activity *259 exceeds the deductions allowed under section 183(b)(1). Section 162(a) allows as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. In order to constitute the carrying on of a trade or business under section 162, an activity must be entered into, in good faith, with the dominant objective of realizing a profit therefrom. Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Hirsch v. Commissioner,315 F.2d 731 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; See also Brannen v. Commissioner,722 F.2d 695 (11th Cir. 1984), affg. 78 T.C. 471 (1982); Hager v. Commissioner,76 T.C. 759 (1981), and cases cited therein. "Profit," in this context, means economic profit, independent of tax savings. Surloff v. Commissioner,81 T.C. 210 (1983). The issue *260 of whether a taxpayer engages in an activity with the requisite intention of making a profit is one of fact to be resolved on the basis of all the surrounding facts and circumstances. Sec. 1.183-2(b), Income Tax Regs.; Engdahl v. Commissioner,72 T.C. 659 (1979); Allen v. Commissioner,72 T.C. 28 (1979). In determining whether an activity is engaged in for profit, the following factors are to be considered: (1) The expertise of the taxpayer in carrying on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs.; Boyer v. Commissioner,69 T.C. 521 (1977); *261 Benz v. Commissioner,63 T.C. 375 (1974). It is not intended, however, that only the aforesaid factors be taken into account in making the determination. Sec. 1.183-2(b), Income Tax Regs. No single factor is determinative and the issue is to be resolved by examining all the circumstances. Fuchs v. Commissioner,83 T.C. 79, 98 (1984); Dean v. Commissioner,83 T.C. 56, 74 (1984); Flowers v. Commissioner,80 T.C. 914, 931 (1983); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). In our determination, we ascribe greater weight to objective factors than to mere statements of intent. Fuchs v. Commissioner,supra;Siegel v. Commissioner,78 T.C. 659, 699 (1982); Engdahl v. Commissioner,supra.
Respondent's determinations are presumptively correct. Welch v. Helvering,290 U.S. 111 (1933). Petitioner bears the burden of proof. Rule 142(a). Based upon our *262 review of the entire record, we determine that petitioner's UPC license activities were not engaged in with a profit objective. The mere execution of the necessary paperwork to acquire a territorial license does not constitute a trade or business. Herrick v. Commissioner,85 T.C. 237 (1985); Compare Waddell v. Commissioner,86 T.C. 848 (1986). We are convinced that petitioner executed the required paperwork to engage in the UPC license activity primarily, if not exclusively, to obtain the tax advantages stated within the offering memorandum. Petitioner earned a law degree and masters of business administration degree with concentration in finance and taxation. We found petitioner to be an intelligent and sophisticated individual. During the year in issue, petitioner was a self employed attorney. Additionally, during such year, petitioner was an employee and Vice-President of World Wide, a venture capital concern. Petitioner served World Wide as a real estate and venture capital consultant. However, petitioner was not a credible witness and we find inconsistencies *263 concerning his testimony. We note that petitioner testified at trial that he had not renewed the UPC license since it had not expired. The UPC license agreement is unambiguous that the renewal option was available provided petitioner served UPC "written notice of his intention to extend and renew this agreement no later than the fifth (5th) anniversary of the commencement date." [3] Accordingly, the renewal option lapsed on December 21, 1983 as petitioner did not comply with the written notice requirement. Petitioner's inconsistency is unexplained. Petitioner also engaged DSC as exclusive sales agent for a term of one year commencing December 21, 1978. Petitioner knew that no sales could occur for 18 to 24 months from the inception of his participation. Furthermore, the need for a sales agent is inconsistent with petitioner's testimony that he desired to involve himself personally with the marketing efforts of the toothbrush. Petitioner testified that he bargained for the two specific territories because of the presence of major department stores in shopping malls within such territories. Such testimony is inconsistent with the stated intention of UPC to market the toothbrush *264 through the dentist as opposed to traditional retail distribution. Lastly, petitioner stated that since the year 1983 he had decided "to take the bull by the horns and contact potential manufacturers." The UPC license agreement is unambiguous that petitioner acquire all toothbrush units from UPC. Licensee manufacturing is not contemplated by the license agreement. Petitioner's testimony is fundamentally flawed and inconsistent with basic aspects of the agreement and we find his stated intention as to manufacturing the toothbrush himself to be illustrative of "bull" of another sort. We have examined petitioner's level of expertise and the expertise of those individuals whom petitioner contacted regarding the toothbrush. Section 1.183-2(b)(2), Income Tax Regs. We do not think, and petitioners do not assert, that petitioner's educational background and professional investment savvy directly translated into expertise regarding *265 ultrasonic dental devices. In the evaluation of the UPC license opportunity, petitioner relied solely upon his business advisors Newman, an attorney and certified public accountant, and Deutsch, a certified public accountant. The inquiry of Newman and Deutsch was limited to an analysis of the tax opinion within the offering memorandum and an inquiry regarding the reputation of the Schekter law firm. Prior to his involvement, petitioner met with members of the Schekter law firm, however, it is clear from the record that the Schekter law firm was involved with the promotion of the UPC license activity and that petitioner met with the Schekter law firm solely to receive and execute UPC paperwork. We find particularly fatal to petitioner's profit objective assertions that petitioner and his advisors failed to investigate the representations within the promotional material. During the year in issue, Dr. Goldman was unaware that UPC distributed his research to promote the sale of UPC licenses for an ultrasonic dental device. In September of 1979, the Securities and Exchange Commissioner informed Dr. Goldman that UPC distributed his research to promote UPC licenses. The promotional materials *266 made unauthorized and inaccurate references to Dr. Goldman, the Goldman article, and the Boston University Graduate School of Dentistry. Petitioner and his advisors were aware that the toothbrush employed new technology not yet perfected for consumer use. We find it incredulous that petitioner and his advisors failed to contact Dr. Goldman during the year in issue regarding the clinical aspects of the toothbrush so as to verify the representations within the offering memorandum. Dr. Goldman testified at trial that the UPC representations were "ridiculous statements that bothered the heck out of me." Such minimal investigation would have ascertained that serious clinical considerations existed concerning the toothbrush and that the credibility of the UPC promotion was in serious doubt due to the unauthorized reference to Dr. Goldman, the Goldman article and the Boston University Graduate School of Dentistry. The Jensen report dated November 17, 1978 and furnished to petitioner by UPC as a promotional item was not written or signed by Jensen. Jensen met with Woodcock in December of 1978. The Jensen report purported to evaluate the UPC license from a marketing perspective with specific *267 reference to the Feldman projection. Jensen testified that he was unaware that UPC intended to franchise territorial licenses and that he did not review the Feldman financial projection. Petitioner and his business advisors did not contact Jensen during the year in issue. Minimal investigation would have ascertained that the Jensen report was totally unauthorized and fabricated. Petitioner and his advisors did not investigate the UPC license opportunity beyond the purview of the purported tax consequences. Starkly evident from the record is the inescapable conclusion that a cursory investigation would have uncovered the spurious representations made by UPC within the promotional materials. Petitioner's sole motivation was to minimize the tax consequences of the substantial and nonrecurring fee received during the year in issue. Failure to undertake fundamental and elementary inquiries and to obtain expert advice in a transaction of this nature and magnitude is not consistent with ordinary business practice. Herrick v. Commissioner,supra at 256. The grave misrepresentations of UPC within the promotional materials heightened by the ease with which a prudent, *268 yet unsophisticated, investor would have exposed the deception belie a determination that petitioner engaged in the UPC license activity for profit. The record indicates a history of substantial deductions attributable to petitioner's 1978 year end UPC investment. [4] No sales were consummated as of the date of trial. Herrick v. Commissioner,supra at 258; sec. 1.183-2(b)(8), Income Tax Regs. We are convinced that petitioner entered the UPC license arrangement solely to offset the tax consequence of the substantial and nonrecurring fee which he had earned in his capacity as a legal and real estate consultant. We are further convinced that the tax advice nonrecourse note in the amount of $40,000 which petitioner accrued and deducted in total as legal and professional services on his 1978 Form 1040 Schedule C relating to the toothbrush activity was executed with the primary intent of tax avoidance to further offset the tax consequences of the substantial and nonrecurring fee. We determine *269 that petitioner is not entitled to business deductions under section 162 due to the absence of profit objective. Section 1253(d) governs the treatment of payments made by a transferee of a franchise. [5] If the payments are "contingent on the productivity, use, or disposition of the franchise," section 1253(d)(1) provides that such payments are deductible within the meaning of section 162. If the payments made by a transferee are not contingent, section 1253(d)(2) governs the tax treatment. Section 1253(d)(2) provides the period over which a transferee may deduct fixed payments depending on whether the license obligation is paid off with a single payment, approximately equal payments, or by any other arrangement for payment. This Court recently held that section 1253(d)(2) embodies a trade or business requirement despite the absence of a specific reference thereto. Herrick v. Commissioner,supra at 266.The use of notes or other valuable property can constitute payment under section 1253(d)(2) provided that the note or property "paid" is not demonstrated to be illusory *270 or without value. Jackson v. Commissioner,86 T.C. 492, 521 (1986). Petitioner is not entitled to amortize the UPC license acquisition fee under section 1253(d)(2) as petitioner did not engage in the UPC license activity within the meaning of section 162. Section 183(b)(1) allows deductions otherwise allowable without regard to whether or not an activity is engaged in for profit. Section 163 provides that a deduction shall be allowed for all interest paid or accrued within the taxable year of indebtedness. Section 212(3) provides the allowance of ordinary and necessary expenses paid or incurred in connection with the determination, collection, or refund of any tax. We determine that petitioner failed to establish an entitlement to deduct expenses under any provision *271 without regard to whether the UPC license activity was engaged in for profit. Petitioner executed three nonrecourse promissory notes and an interest bearing recourse promissory note regarding the toothbrush activity. Each nonrecourse promissory note required quarterly payments of principal and interest determined by multiplying the number of toothbrush units sold and for which payment was collected. [6] On his Form 1040 Schedule C regarding his UPC license activity, petitioner claimed a deduction in the amount of $480.00 as interest on business indebtedness, presumably on the $12,000.00 license fee recourse note bearing seven percent interest due February 1, 1979. Petitioner accrued a deduction in the amount of $40,000 for the full amount of the tax advice nonrecourse note executed to Newman and Deutsch. As of the trial date, no sales were generated as no toothbrushes were manufactured. The record is devoid of any evidence to establish that the license fee recourse note was in fact executed as the only reference to such note is within the license agreement. Consequently, petitioner has failed to satisfy the burden of proof necessary to establish an entitlement to an interest deduction *272 relative to the license fee recourse note. Furthermore, because we have determined that the accrual based toothbrush activity was an activity not engaged in for profit as defined within section 183, petitioner must establish a cash basis entitlement to the otherwise available interest deduction. Petitioner failed to satisfy the burden of proof that such note was in fact executed and delivered or that interest was paid. We also determine that each nonrecourse promissory note was not bona fide indebtedness for tax purposes. Consequently, petitioner is not entitled to deduct any amount pursuant to section 163, and petitioner's assertion that the tax advice nonrecourse promissory note is deductible pursuant to section 212(3) is without merit. It is well settled that in order for a liability to be accruable, it must be binding and enforceable; must not be contingent *273 on a future event; the liability must be certain; and there must be a reasonable belief on the part of the debtor that the liability will be paid. Herrick v. Commissioner,supra at 260; Putoma Corp. v. Commissioner,66 T.C. 652 (1976), affd. 601 F.2d 734 (5th Cir. 1979); United Control Corp. v. Commissioner,38 T.C. 957 (1962). We are satisfied that the nonrecourse notes herein do not satisfy the aforesaid requirements and are not properly accruable. Herrick v. Commissioner,supra at 260. Furthermore, quarterly payment of principal and interest was to be determined solely based upon the number of units sold for which payment was collected. In the instant case, the toothbrush was a highly speculative product not manufactured and not available for distribution at the time the notes were executed. We determine that the non-recourse notes were contingent and that payment was remote. Estate of Baron v. Commissioner,83 T.C. 542 (1984); Saviano v. Commissioner,80 T.C. 955 (1983) affd. 765 F.2d 643 (7th Cir. 1985). Compare Jackson v. Commissioner,86 T.C. 492 (1986). *274 The tax advice nonrecourse note was a totally illusory and transparent attempt to generate an exaggerated loss in the investment year. The tax advice nonrecourse note was not signed by petitioner and petitioner failed to establish whether such note was in fact executed and delivered to Newman and Deutsch. Consequently, the tax advice nonrecourse note was not genuine indebtedness and no amount is deductible under section 212(3) irrespective of the method of accounting employed by petitioner. Petitioner asserts, by reference within the petition, the trial memorandum, and reply brief, an entitlement to elect the income averaging provisions of sections 1301 to 1305 inclusive. The record does not include any relevant information, concerning the "base period" taxable years. Sec. 1302(c)(2). The income averaging election may be effectuated for the first time before the Court. Hosking v. Commissioner,62 T.C. 635 (1974). The only issue in Hosking was the timeliness of the election made at trial, and all facts as to the correct amount of taxable income for each base *275 period taxable year were within the record. [7] In Cloes v. Commissioner,79 T.C. 933 (1982), we determined that the income averaging provisions constitute new issues which may not be raised in a Rule 155 proceeding. We stated in Cloes that the income averaging provisions place each base period year before the Court and that respondent may contest any and all items of income and deduction for the base period years. Cloes, 79 T.C. supra at 937. Petitioner has not satisfied the burden of proof necessary to establish an entitlement to the income averaging provisions as petitioner presented no evidence concerning the base period years. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioner in the singular form hereinafter refers to petitioner Norman E. Powell.↩
3. The renewal provision stated that the license may be renewed for the fee of $100,000.00 payable by $12,500 cash and $37,500 by nonrecourse promissory note. The principle amount of cash and nonrecourse note is only $50,000.00.↩
4. Petitioner claimed a loss in the amount of $37,380.00 regarding his UPC license activities on his joint 1979 Federal income tax return.↩
5. The term "franchise" includes an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specific area. Sec. 1253(b)(1)↩.
6. ↩
Principal
Per Unit
Nonrecourse Notes
Amount
Payment
The license fee nonrecourse note
$175,000
$5.00
The advertising nonrecourse note
64,000
2.00
The tax advice nonrecourse note
40,000
5.00
7. Pereira v. Commissioner,T.C. Memo. 1976-66↩, n. 2.