STANLEY P. SALZMAN AND MARILYN SALZMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Salzman v. Commissioner
Docket No. 19571-83.
United States Tax Court
T.C. Memo 1988-86; 1988 Tax Ct. Memo LEXIS 108; 55 T.C.M. (CCH) 278; T.C.M. (RIA) 88086; February 29, 1988. Morton L. Ginsberg and Joseph I. Kazarnovsky, for the petitioners. Victoria Wilson Fernandez and Rose E. Gole, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the taxable years 1978 and 1979 in the amounts of $ 25,456.62 and $ 20,432.81, respectively. By amendment to answer filed prior to trial, respondent also seeks (1) increased interest pursuant to section 6621(c)[1] on the grounds that part of the deficiency for each year was attributable to tax motivated transactions and (2) damages pursuant to section 6673. *110 The issues [2] for decision are as follows: (1) Whether certain license activities with respect to "The Ultransonic Plaque Control Instrument" and "The Ultrasonic Plaque Control Technique" were undertaken for profit within the meaning of section 183 or, alternatively, whether the transactions with respect thereto lacked economic substance apart from anticipated tax benefits; (2) Whether petitioners are entitled to a depreciation deduction and investment credit with respect to certain computer equipment; (3) Whether the license activities constitute tax motivated transactions within the meaning of section 6621(c); and (4) Whether respondent is entitled to damages under section 6673 because petitioners maintained the instant case primarly for purposes of delay. *111 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits thereto are incorporated herein by reference. Petitioners filed joint income tax returns for the taxable years 1978 and 1979. At the time the petition was filed in this case, petitioners resided in Great Neck, New York. Petitioner Stanley P. Salzman ("Mr. Salzman") has a bachelor's degree and a law degree and has practiced law since 1956. During the years in issue, 1978 and 1979, Mr. Salzman was a self-employed attorney. Petitioner Marilyn Salzman ("Mrs. Salzman") has a college degree. She was employed on a part-time basis by her husband's law practice, working up to thirty-five hours per week and earning $ 14,950 and $ 15,600 during the years 1978 and 1979, respectively. For convenience, our remaining finding of facts and opinion will be grouped together by the issues to which they relate. THE TOOTHBRUSH ADDITIONAL FINDINGS OF FACT Petitioners' filed a Schedule C with each of their joint income tax returns for the years 1978 and 1979, reflecting the following deductions from a "business of distributing a dental device": 1978
1979
Advertising & Promotion
$ 37,400.00
$    -0-   Amortization & License
Fee
11,111.11
11,111.11
Interest on Business
Indebtedness
228.73
7,590.00
Sales Agency Fee
600.00
600.00
Total Deductions
$ 49,339.84
$ 19,301.11
*112 Neither Schedule C reported any income. Petitioners first became interested in the Ultrasonic Plaque Control Instrument (hereinafter sometimes referred to as the "toothbrush") in late November or early December 1978. In November or December of 1978, petitioners were furnished with a document entitled "The Ultrasonic Plaque Control Technique-Information Memorandum Relating to Exclusive License Rights" (the "information memorandum"). The information memorandum discussed license rights to the toothbrush and was distributed on behalf of Ultransonic Plaque Control Laboratories, Inc. ("UPC") and Inventel Corporation ("Inventel"). Hereinafter we shall refer to the transactions between those corporations and petitioners as the "promotion." The promotion was presented by Martin Hecht to Mr. Salzman, who was acting on behalf of Mrs. Salzman. Petitioners received tax advice regarding the income tax consequences of the promotion from their accountant and Martin Hecht. Under the terms of the promotion, Mrs. Salzman was required to execute all transactional documents simultaneously and return all of the promotional documents. A blank copy of each of the documents executed by Mrs. Salzman *113 was attached to the information memorandum before Mrs. Salzman executed any documents. Mrs. Salzman executed and returned all the required documents on December 20, 1978. Pursuant to the information memorandum, Mrs. Salzman submitted a license application to Inventel that was identical, except in amount and territory, to the application submitted to Inventel by the taxpayer in Powell v. Commissioner,T.C. Memo. 1986-369. [3]
Pursuant to that license application, Mrs. Salzman signed a license agreement, dated December 20, 1978, with UPC to market and/or sell the toothbrush. The terms of the license agreement between UPC and Mrs. Salzman are identical (except in amount) to the license agreement between UPC and the taxpayer in Powell. Under the agreement, UPC reserved the right to select the license territory *114 in its sole discretion. The license territory granted to Mrs. Salzman, however, was located in Great Neck, New York, where petitioners reside. The license agreement granted Mrs. Salzman the right to promote, distribute, market, and sell toothbrushes in the specific territories, provided that each sale was a "permitted sale" as defined in the agreement. A "permitted sale" was defined as a sale of the toothbrush either through dentists in the territory or directly to the ultimate users in the territory. UPC reserved the right under the license agreement to change the design of the toothbrush at any time without notice to Mrs. Salzman. Under the terms of the license agreement, a transfer of the license by Mrs. Salzman constituted a material breach of that agreement. Mrs. Salzman was required by the agreement to purchase all units of the toothbrush from UPC. The license for the toothbrush commenced on December 20, 1978, and terminated on December 31, 1986. The license agreement included a renewal option of five years, provided that Mrs. Salzman exercised such option in writing on or before December 20, 1983, tendered $ 12,500 in cash, and executed a $ 37,500 non-recourse promissory *115 note. The license agreement provided that the purchase price for the license was $ 100,000, payable to UPC as follows: $ 6,500 in cash, $ 6,000 by a recourse promisory note due February 1, 1979, and $ 87,500 by a non-recourse promissory note maturing on January 1, 1986 (the "license fee non-recourse note"). The license fee non-recourse note was signed by Mrs. Salzman on December 20, 1978, and required quarterly payments in an amount determined by multiplying the number of toothbrushes sold and paid for during the preceding calendar quarter by the sum of $ 5. The terms of the license fee non-recourse note executed by Mrs. Salzman are identical (except in amount) to the terms of the license fee non-recourse note executed by the taxpayer in Powell.
The license fee non-recourse note was secured by the license agreement, and by all Mrs. Salzman's intangible and tangible property rights arising out of the toothbrush, including inventory and accounts receivable. The terms of the security agreement between UPC and petitioners are identical to the terms of the security agreement between the taxpayer and UPC in Powell.
The license agreement also provided that Mrs. Salzman would *116 contribute the amount oF $ 37,400 to the "Advertising and Promotional Fund" administered by Hanson, Fassler and Associates, Inc. ("Hanson, Fassler"). Mrs. Salzman was to pay that amount to Hanson, Fassler as follows: $ 5,400 in cash, and $ 32,000 by a non-recourse promissory note (the "advertising non-recourse note"). The advertising non-recourse note required quarterly payments of principal and interest in an amount determined by multiplying the number of toothbrushes sold and paid for by the sum of $ 2. The advertising non-recourse note was secured by the same collateral that secured the license fee non-recourse note. The advertising non-recourse note is identical (except in amount) to the advertising non-recourse note executed by the taxpayer in Powell.
Mrs. Salzman relied solely on the representation of Martin Hecht in selecting Hanson, Fassler to market the toothbrush. Hanson, Fassler billed UPC for actual work performed and costs incurred, and payment was not dependent upon sales. Hanson, Fassler terminated the relationship with UPC in 1982 but continued to market an ultrasonic dental device. Mrs. Salzman executed an optional sales agency agreement dated December 20, 1978, which *117 granted Dental Sales Consultants, Inc. ("DSC") an "exclusive" selling agency over the toothbrush for Mrs. Salzman's license territory. Mrs. Salzman conveyed her right to sell the toothbrush to DSC for one year. The sales agency agreement required a $ 600 payment to DSC upon the execution of the agreement and $ 1 for each toothbrush sold by DSC for which payment was received from the customer. The offer to act as sales agent stated that a licensee may derive some additional tax advantages by entering the sales agency agreement. Any notice, request, demand, statement, or other communication provided for in the sales agency agreement was required to be in writing. The sales agency agreement executed by Mrs. Salzman is identical (except in amount) to the sales agency agreement executed by the taxpayer in Powell.
No payments were made on either of the non-recourse notes. Petitioners made payments of $ 12,500 and $ 6,050.17 to Inventel on December 18, 1978, and February 1, 1979, respectively. The payment of $ 12,500 represented the sum of $ 6,500 cash due to UPC pursuant to the license agreement, $ 5,400 cash due to Hanson, Fassler for the Advertising and Promotional Fund, and *118 $ 600 cash due to DSC pursuant to the sales agency agreement. Petitioners' second payment represented the principal of $ 6,000 plus accrued interest on the recourse note due to UPC as part of the purchase price of the license. The information memorandum stated, "The granting of a License involves entry into a highly competitive business bearing a high degree of risk, and is suitable only for persons having substantial financial resources who understand the long-term nature, the tax consequences and the risk factors associated with this type of business." The information memorandum stated that UPC intended to market the toothbrush through the dentist, instead of through traditional channels of distribution, in order to insure the "appropriate professional image and maximum credibility and serious consumer acceptance." Petitioners used the law firm of Schekter, Aber, and Hecht, P.C. in connection with the promotion. That law firm prepared the tax opinion included in the information memorandum and was the law firm used by the taxpayer in Powell.
Petitioners received a copy of an article written by Dr. Henry M. Goldman ("Dr. Goldman") entitled "Effectiveness of the Ultrasonic *119 Toothbrush in a Group of Uninstructed Subjects". The taxpayer in Powell received a copy of the same article as part of the promotional documents received in connection with the licensing and franchising activities. Dr. Goldman [4] is a practicing periodontist and a Professor at the Boston University Graduate School of Dentistry. Dr. Goldman is a world renowned periodontist and enjoys a high standing in the dental community. Dr. Goldman tested an ultrasonic toothbrush in 1972 as a result of his professional interest in the removal of plaque, and he was not paid to conduct that research. Dr. Goldman's experimentation was not extensive and was intended to encourage research by other periodontists. Dr. Goldman's research was published in the Journal of Periodontology in February 1974. Dr. Goldman was unaware that UPC was distributing his research to promote the sale of licenses for an ultrasonic toothbrush. In September 1979, Dr. Goldman was informed by a representative of the Securities and Exchange Commission that UPC was using his research and making references to and quoting him in its promotional material. Dr. Goldman's attorney instructed UPC to refrain from further reference *120 to or use of Dr. Goldman's name or research. Statements attributed to Dr. Goldman by UPC were exaggerated and generally untrue, as well as unauthorized. Petitioners also received a copy of a report purportedly prepared by C. Neil Jensen ("Mr. Jensen") entitled "Ultrasonic Plaque Control License Evaluation" (the "Jensen report"). The taxpayer in Powell received a copy of the same report. Mr. Jensen [5] was associated with Lactona Corporation, the dental division of Warner Lambert Corporation. Mr. Jensen became aware of UPC during the year 1978. John Woodcock ("Mr. Woodcock") engaged in a telephone conversation with Mr. Jensen on behalf of UPC. Prior to 1978, Mr. Jensen had encountered Mr. Woodcock at various dental conventions. Mr. Jensen met twice with Mr. Woodcock, on December 8 and 9, 1978, to discuss the potential market for a plaque removal device. Mr. Jensen performed a limited analysis and located several dental articles in preparation for the meetings with Mr. Woodcock. Each meeting lasted about four hours and Mr. *121 Jensen billed Mr. Woodcock $ 200 for eight hours of services. Mr. Jensen was not aware that UPC intended to license the toothbrush by territory. No financial projections, sales data, information memorandum, or license agreement was provided to Mr. Jensen. The Jensen report furnished by UPC to petitioner was neither written nor signed by Mr. Jensen. Petitioners were furnished with financial projections of estimated average financial operations for the license of the toothbrush. The projections were prepared by the accounting firm of Rose, Feldman, Radin, Pavone & Skehan. The same projections were furnished to the taxpayer in Powell. No audit or verification procedures were undertaken by Rose, Feldman, Radin, Pavone & Skehan regarding any information upon which the financial projections were based. The financial projections relied upon representations by UPC in computing projected sales. Mrs. Salzman represented in the license application that she would rely on the advice of her husband and her accountant with respect to her investment in the promotion. *122 Petitioners in fact relied upon the information provided to them by the promoters of the toothbrush. Dr. Herbert I. Oshrain ("Dr. Oshrain") has been a practicing periodontist since 1958 and was a professor at Columbia University Dental School. Dr. Oshrain [6] conducted a clinical test on an ultrasonic toothbrush in 1973 under the auspices of Columbia University. The conclusion of Dr. Oshrain was that the ultrasonic toothbrush was no more effective than a manual toothbrush in the removal of plaque. The toothbrush was patented by Arthur Kuris of Riverdale, New York, on March 11, 1980. OPINION The first issue is whether the license of the toothbrush was an activity undertaken for profit within the meaning of section 183. Petitioners [7] must show that Mrs. Salzman had a bona fide objective of making a profit when she engaged in the transactions with respect to the license of the toothbrush. Dreicer v. Commissioner,78 T.C. 642, 644 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); *123 Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981). Whether a taxpayer has an actual and honest profit objective is a question of fact, to be resolved on the basis of all the facts and circumstances of the case, and greater weight should be given to the objective facts than to mere statements of intent by the taxpayer. Sec. 1.183-2(a) and (b), Income Tax Regs.; Gefen v. Commissioner,87 T.C. 1471, 1497 (1986); Dreicer v. Commissioner, supra;Engdahl v. Commissioner, supra;Churchman v. Commissioner,68 T.C. 696, 701 (1977). Petitioners have failed to persuade us that their case is distinguishable in any material *124 way from Powell, where we held that the taxpayer did not have the requisite profit motive. [8] The parties stipulated that the facts involved in Powell are identical (except for dollar amounts) to the following facts in the instant case: the activities engaged in by petitioners with respect to the license; the terms of the license agreement executed by Mrs. Salzman; the terms of the license fee non-recourse note executed by Mrs. Salzman; the terms of the security agreement executed by Mrs. Salzman; the terms of the advertising non-recourse note executed by Mrs. Salzman; the license application submitted by Mrs. Salzman; the license application submitted by Mrs. Salzman to Inventel Corporation; [9] the promotion documents received by petitioners; the testimony of Dr. Goldman, Mr. Jensen, and Dr. Oshrain regarding the toothbrush; the education of petitioners, their professional background, and their lack of any expertise regarding ultrasonic dental devices; the law firm employed by petitioners; the failure of petitioners' activities to constitute a trade or business; the toothbrush involved in the promotion; and the transactional documents executed by petitioners. *125 In Powell we held that the taxpayer was not entitled to deductions with respect to the toothbrush because he did not engage in the activities for profit. In Powell we found the following factors to be most significant: the taxpayer's testimony was inconsistent and lacked credibility; the taxpayer and the individuals relied upon by him lacked the level of expertise necessary to evaluate properly the profit potential of the toothbrush; the taxpayer failed to investigate adequately the representations in the promotional material; no sales were consummated; and the license arrangement was entered into by the taxpayer solely to offset the tax consequence of a substantial unrelated item of income. We stated that the failure of the taxpayer to investigate the promotional materials was particularly fatal to his assertions of a profit objective. In that regard we noted: Such minimal investigation would have ascertained that serious clinical considerations existed concerning the toothbrush and that the credibility of the UPC promotion was in serious doubt due to the unauthorized reference to Dr. Goldman, the Goldman article and the Boston University Graduate School of Dentistry. *126 The Jensen report dated November 17, 1978 and furnished to petitioner by UPC as a promotional item was not written or signed by Jensen. * * * Minimal investigation would have ascertained that the Jensen report was totally unauthorized and fabricated. [The taxpayer] and his advisors did not investigate the UPC license opportunity beyond the purview of the purported tax consequences. Starkly evident from the record is the inescapable conclusion that a cursory investigation would have uncovered the spurious representations made by UPC within the promotional materials. * * * The grave misrepresentations of the UPC within the promotional materials heightened by the ease with which a prudent, yet unsophisticated, investor would have exposed the deception belie a determination that [the taxpayer] engaged in the UPC license activity for profit.
Powell v. Commissioner,52 T.C.M. 163, 168, 55 P-H Memo T.C. par. 86,369 at 86-1677 (1986). The conclusions we drew in Powell regarding the egregious defects in the promotional materials identical to those herein give us serious concern about whether petitioners in the instant case could have entertained any *127 true profit motive if they had undertaken even a minimal investigation of the facts contained in the promotional materials. In that regard, petitioners' failure to employ independent professionals with the level of expertise necessary to advise them adequately of the potential profitability of the license is particularly significant. The information memorandum urged investors to obtain an indepdent expert opinion as to the reasonableness and value of the licensing fee prior to submitting a license application. Petitioners ignored that advice. These troubling facts alone convince us that petitioners did not enter into the activity for profit. There are, however, a multitude of additional facts which also support our holding. Petitioners did not negotiate the license fee required by the license agreement. Petitioners did not negotiate the terms of the license fee non-recourse note. Petitioners did not negotiate the terms of the advertising non-recourse note. No payment was made on the license fee non-recourse note. No payment was made on the advertising non-recourse note. No sales of the toothbrush have been made in the territories set forth in the license. Petitioners had *128 no personal liability for either the payment of the non-recourse notes or the performance of any obligations thereunder. Petitioners made no significant effort to determine the market potential of the toothbrush among either dentists or ultimate users. Petitioners never made any inquiries into the expertise of Hanson, Fassler in marketing dental products. No expert in the marketing and distribution of dental devices testified on behalf of petitioners. No expert in the area of periodontistry or ultrasonics ever examined the ultrasonic toothbrush on behalf of petitioners. No expert ever performed clinical tests using the toothbrush on behalf of petitioners. Petitioners never contacted Dr. Goldman. Petitioners never made any scientific inquiries into the efficiency of the toothbrush. Petitioners never secured an independent appraisal evaluating the market potential of the toothbrush. Petitioners did not know whether the toothbrush had been patented at the time Mrs. Salzman executed her license. Petitioners had no experience in reviewing, negotiating, or giving advise with respect to licensing or franchise agreements and rights. Petitioners had no expertise in market research activities, *129 the marketing and distribution of consumer products, or ultrasonics technology. Petitioners did not view a prototype of the toothbrush prior to entering into the license agreement, nor did they ever receive the toothbrush in a marketable form. In short, we find that this case is not materially different from Powell. We accordingly hold that petitioners did not engage in the license of the toothbrush for profit. [10] We therefore hold that petitioners are not entitled to any deductions with respect to the license activity. [11]
THE COMPUTER
*130 ADDITIONAL FINDINGS OF FACT On their 1979 tax return, petitioners claimed an investment credit of $ 10,517.20 and a depreciation deduction in the amount of $ 4,382.04 with respect to certain computer equipment. The investment credit and depreciation were computed using a cost basis of $ 105,172. Mr. Salzman, doing business as Friesner & Salzman, [12] leased an IBM System 34 computer, complete with attachments, parts, and accessories (hereinafter referred to as the computer equipment), from Granrich Capital Corp. pursuant to a lease dated October 31, 1979. Mr. Salzman took possession of the computer equipment on October 31, 1979, and placed it in service in his law practice during 1979. Granrich Capital Corp. determined that it would elect to treat Mr. Salzman as having purchased the computer equipment for purposes of the investment *131 credit. Granrich Capital Corp. delivered to Mr. Salzman a document evidencing such an election (the "election letter"). Mr. Salzman consented to the election letter by signing it. The basis of the computer equipment to Granrich Capital Corp. was $ 74,888, as set forth in the election letter. The two page election letter read as follows: October 31, 1979
Gentlemen:
Please be advised that under the Internal Revenue Code -- Section 38, and for such purposes only, we elect to treat you, the lessee, as having purchased the property under the lease dated October 30, 1979.
So that you can use the investment credit allowed, we ask that you complete the following information required by the Treasury Regulation:
1. Name, address, tax payer number: Lessor
Lessee
Stanley P. Salzman d/b/a
GRANRICH CAPITAL CORP
Friesner & Salzman
500 Old Country Road
280 Northern Blvd.
Garden City, New York 11530
Great Neck, New York 11021
Account # XX-XXX0159
Account # XX-XXX8959
2. District Directors office at which the income tax returns of the lessee and lessor are filed: Lessor
Lessee
Holtsville
Holtsville, N.Y.
3. *132 Taxable year of the lessee with respect to which such general election is made Dec 31, 1979.
4. Description of each property with respect to which the election is being made: As per attached Schedule of Equipment (Exhibit A)
5. Date on which possession of the property (or properties) is transferred to the lessee: Oct. 31, 1979
6. Estimated useful life category of the property (or properties) in the hands of the lessor: 8 years
7. The basis of the property to the lessor: $ 74,888.00
Please complete the corresponding information to that which has already been completed by Granrich. Then, sign and return both copies of this letter signifying your consent to the above and your agreement to accept this investment credit. Upon receipt of these copies we will countersign one copy and return it to you. GRANRICH CAPITAL COPR
Lessor BY: (Signed) Richard Grenet
Accepted:    Date
Stanley P. Salzman d/b/a
Friesner & Salzman
Lessee
BY: (Signed) Stanley P. Salzman
EXHIBIT "A" (SCHEDULE OF EQUIPMENT)
Forming a part of the lease agreement between Stanley P. Salzman d/b/a Friesner & Salzman, *133 Lessee, and GRANRICH CAPITAL CORP., LESSOR LEASE DATED: OCTOBER 30, 1979 PROPERTY LOCATED AT: 280 Northern Blvd. Great Neck, New York 10021
ITEM #
QUANTITY
DESCRIPTION
1
1
IBM System 34 Computer complete with all
attachments, parts, accessories
including:
Type/Serial #
Processing Unit
5340-24477
Display Station
5251-65138
Display Station
5251-65139
Display Station
5251-65140
Printer
5211-64167
Display Station
5251-69467
Display Station
5251-69468
Display Station
5251-69469
2
1
Standard Register Burster
3
1
Swingline Table Top Decollator
4
1
CRT 60 X 30 X 26 Table
5
2
CRT Basic Returns
6
2
Universal Stands for CRT Terminal w/Pair
of In and Out Baskets & Copy Holder
Stanley P. Salzman d/b/a Friesner & Salzman
Lessee
BY: (Signed) Stanley P. Salzman
AGREED TO: GRANRICH CAPITAL CORP.
Lessor
BY: (Signed) Richard Grenet
(Title) OPINION The issue is whether petitioners are entitled to a deduction for depreciation and an investment credit with respect to the computer equipment. In order to be entitled to the deduction *134 for depreciation, petitioners must show that Mr. Salzman acquired a depreciable property interest. The record clearly establishes that Mr. Salzman leased the computer equipment from Granrich Capital Corp. We have held from the beginning of our recorded history that an interest of a lessee in leased property is not depreciable. Ostheimer v. Commissioner,1 B.T.A. 18 (1924). See also Miller V. Commissioner,68 T.C. 767 (1977); Gladding Dry Goods Co. v. Commissioner,2 B.T.A. 336 (1925). Petitioners have the burden of proving that Mr. Salzman had a depreciable interest in the property. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). In fact, this Court required strong proof before we allow a taxpayer to disregard the transactional form he has adopted. Coleman v. Commissioner,87 T.C. 178, 202 (1986), affd. in an unpublished opinion 833 F.2d 303 (3d Cir. 1987); Bolger v. Commissioner,59 T.C. 760, 767 n.4 (1973). Petitioners certainly have not proved that we should *135 overlook the form of Mr. Salzman's leasehold (as evidenced by the election letter) and find such a depreciable interest; we therefore hold that they are not entitled to the deduction for depreciation. With respect to the investment credit, section 48(d)(1) requires that a "pass-through" election can made "at such time, in such manner, and subject to such conditions as are provided by regulations." Section 1.48-4(a)(1), Income Tax Regs., provides that the credit may be "passed through" upon the following conditions: (1) the property must be "section 38 property" in the hands of the lessor; (2) the property must be "new section 38 property"; (3) the original use of the property must commence with the lessee: (4) the property would constitue "new section 38 property" to the lessee if the lessee had actually purchased the property; (5) the lessor must not be a person referred to in section 46(d)(1); and (6) a statement of election to treat the lessee as a purchaser must be filed within the time and in the manner prescribed by section 1.48-4(f) and (g) of *136 the regulations. In Kerry v. Commissioner,89 T.C. 327, 333-334, (1987), we stated: The time, manner, and conditions for filing a statement of election are prescribed in section 1.48-4(f) and (g), Income Tax Regs. The election may be made on a property-by-property basis or as a general election applicable to all properties transferred to the lessee by the lessor during the taxable year. The election statement must be signed by both the lessor and the lessee, and the lessee's signature will be deemed to constitute his consent to the election. The statement of election must be filed with the lessee on or before the due date (including extensions) of the lessee's return for the year in which possession under the lease was transferred. Once filed with the lessee, the statement of election is irrevocable for the taxable year of the lessee with respect to which the election is made. In making either a property-by-property or a general election, the statement of election shall provide: *137 (1) the name, address, and taxpayer account number of the lessor and the lessee, and (2) the district director's office with which the income tax return of the lessor and lessee are filed. Additionally, in making a property-by-property election, the statement of election must provide the following information: (1) A description of each property with respect to which the election is being made; (2) the date on which possession of the property is transferred to the lessee; (3) the estimated useful life category of the property in the hands of the lessor; and (4) the amount for which the lessee is treated as having acquired the leased property. The record as a whole establishes that the foregoing conditions were satisfied. Respondent does not argue that these conditions were not satisfied, and we take that as a concession by him that the foregoing conditions were met. [13] Respondent rests solely on the argument that petitioners have failed to prove that a valid election was made. [14] Respondent's bases for his argument are that the election letter was not signed by the lesssor and that the election letter was hearsay evidence that does not fall within the exception of rule *138 803(6) of the Federal Rules of Evidence (the "business records" exception) because the purchase of computer equipment is not "regular activity" for a law firm. Both arguments are specious. With respect to the first argument, the election letter admitted into evidence was signed by both the lessor and the lessee. With respect to the hearsay argument, a lawyer must acquire furniture, equipment, books, and other capital items in order to carry on the lawyer's profession. It is certainly part of the regular activity of such a business to keep such a document in its records. The document was offered through Mr. Salzman, the sole owner of the business and the custodian of its records. Thus, the election letter was properly admitted into evidence. *139 The requirements of section 1.48-4(a)(1) and (f), Income Tax Regs., having been satisfied, petitioners are entitled to investment credit with respect to a qualified investment of $ 74,888 [15] in the computer equipment. ADDITIONAL INTEREST Respondent also seeks increased interest pursuant to section 6621(c) on the ground that petitioners' activities with respect to the toothbrush were tax motivated. In that respondent first asserted the issue in his amended answer, he bears the burden of proof. Parker v. Commissioner,86 T.C. 547, 566 (1986). We disallowed the deductions relating to the toothbrush on the ground that petitioners did not enter into the license transactions with a genuine profit motive. Deductions disallowed because an activity was not engaged in for profit are considered to be attributable *140 to tax motivated transactions for purposes of section 6621(c). Sec. 301-6621-2T, A-2(6) and A-4(1), Temporary Proced. & Admin. Regs., T.D. 7998, 1985-1 C.B. 368, 49 Fed. Reg. 59394 (Dec. 29, 1984); Patin v. Commissioner,88 T.C. 1096, 1129 (1987). Accordingly, we find that respondent has met his burden and that the increased interest rate under section 6621(c) is applicable to the portion of petitioners' underpayment that is attributable to the disallowed deductions from the toothbrush license activities. DAMAGES Respondent last asks for damages pursuant to section 6673 on the ground that petitioners maintained the instant case primarily for purposes of delay. If the toothbrush transactions had been the only matter at issue, we might have been inclined to agree with respondent. In that we held for petitioners on the issue of the investment credit, however, we decline to impose any section 6673 damages on petitioners. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code as in effect during the taxable years in issue, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. The petition raises the statute of limitations as an issue. Respondent affirmatively asserted in his answer that the statutory notice of deficiency was timely mailed to petitioners, that the parties consented in writing on February 1, 1982, to an extension of the statute of limitations for the taxable year 1978, and that the deficiency for the taxable year 1979 was timely pursuant to section 6501(a). Respondent filed a motion pursuant to Rule 37(c) requesting the Court to deem such allegations admitted. We granted respondent's motion and ordered that the undenied affirmative allegations of fact contained in paragraph 7(a) through 7(b)(2) of respondent's answer were admitted. The statute of limitations has not been raised in the briefs and we therefore deem the issue conceded by petitioners. Rule 142(a). ↩
3. Inventel was not mentioned by name in the Powell opinion; however, the parties stipulated this fact, as well as to the subsequent facts set out in the remainder of the findings of fact relating to Powell. In Powell we held that another licensee of UPC did not undertake the license activities for profit within the meaning of section 183↩. 4. Dr. Goldman testified in Powell↩ about the toothbrush and a transcript of that testimony was stipulated as a part of the instant case. 5. Mr. Jensen testified in Powell↩ and a transcript of that testimony was stipulated as a part of the instant case. 6. Dr. Oshrain testified about the toothbrush in Powell↩ and a transcript of that testimony was stipulated as a part of the instant case. 7. The documents relating to the license of the toothbrush were signed solely by Mrs. Salzman. However, petitioners contend that Mrs. Salzman entered into the license as a joint venture with Mr. Salzman. The finding as to whether the transaction was entered into as a joint venture is not necessary to our decision. ↩
8. Petitioners' briefs do not conform to Rule 151(e). They provide little more than argument and make no reference to any specific evidence contained in the record. Petitioners merely argue that the record as a whole distinguishes this case from the Powell↩ case, without pointing to any specific evidence. 9. As noted above, the license application and the license agreement in Powell↩ contemplated a different territory than the one herein. 10. The parties have also undertaken an analysis of this case under our decision in Rose v. Commissioner,88 T.C. 386 (1987). We would reach the same result in this case under a Rose analysis. In fact, in Rose we specifically cited Powell as a case involving the sort of "generic tax shelter" in which a taxpayer's tax motivation is apparent. 88 T.C. at 412-413↩. 11. Petitioners do not contend that any of their deductions are allowable without regard to whether an activity is engaged in for profit under section 183(b)(1)↩. We therefore consider the issue conceded by petitioners. Rule 142(a). 12. Mr. Salzman testified that he and a Mr. Friesner were formerly partners, but that Mr. Friesner had retired from the practice of law several years before 1979. As part of an agreement between Messrs. Salzman and Friesner, Mr. Salzman was permitted to practice law as a sole practitioner who did business under the name "Friesner & Salzman." ↩
13. Respondent's brief makes reference to some uncertainty concerning what portion of the computer's basis was attributable to software. We recently have held that investment credit is not available on investments in computer software. Ronnen v. Commissioner, 90 T.C.    (Jan. 21, 1988). The second page of the election letter lists specific property on which the election was made; however, none of the property listed is software. We speculate that the difference between the $ 105,172 basis in the computer equipment used on petitioner's tax return and the $ 74,888 basis listed in the election letter may be attributable partly or wholly to computer software. Regardless of the reason for the difference between the two bases, however, we are satisfied that the property listed in the election letter did not include software. Thus, the Ronnen↩ case is inapplicable to the property listed in the election letter. 14. Respondent also asserts that no document evidencing the election was filed with petitioners' 1979 tax return. Respondent, however, offers no authority under which a lessee is required to file any such document with his tax return, and we have found no such authority. ↩
15. Petitioners' tax return claimed investment credit on computer equipment having a basis of $ 105,172; however, we have seen no evidence to indicate that investment credit is allowable on any amount greater than the $ 74,888 listed in the election letter. ↩